[Crim. No. 25421. Sept. 8, 1987.]

THE PEOPLE, Plaintiff and Respondent, v.
THOMAS WILLIAM JEFFERS, Defendant and Appellant.

## COUNSEL

Frank O. Bell, Jr., State Public Defender, under appointment by the Court of Appeal, and Richard Lennon, Deputy State Public Defender, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Robert R. Anderson and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**KAUFMAN, J.**—In late 1980 the California Legislature began hearings which resulted in the Roberti-Imbrecht-Rains-Goggin Child Sexual Abuse Prevention Act (Stats. 1981, ch. 1064, §§ 1-6, pp. 4093-4096) which included a mandatory sentencing provision, Penal Code section 1203.066.[1] This

---

[1] All further statutory references are to the Penal Code, unless otherwise noted.

Section 1203.066 provides: "(a) Notwithstanding Section 1203, probation shall not be granted to, nor shall the execution or imposition of sentence be suspended for, nor shall a finding bringing the defendant within the provisions of this section be stricken pursuant to Section 1385 for, any of the following persons:

"(1) A person convicted of violating Section 288 when the act is committed by the use of force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person.

"(2) A person who caused bodily injury on the child victim in committing a violation of Section 288.

section lists 10 categories of sexual offenses and provides that a defendant convicted of any of them may not be granted probation. The ineligibility is absolute as to six of the categories but as to the remaining four categories probation may be granted if imprisonment is "not in the best interest of the child," if rehabilitation of the defendant is feasible, if failure to imprison the defendant will not result in "threat of physical harm to the child victim," and if the defendant "is the victim's natural parent, adoptive parent, stepparent, relative, or is a member of the victim's household who has lived in the household." Interpretation of this last requirement is at issue in this case. The questions presented are: (1) the meaning of the expression "a member of the victim's household" and (2) whether, to be eligible for probation, a defendant who is not a parent, stepparent, or relative, but who has lived in the victim's household, must be a member of the victim's household at the time of sentencing or at the time of commission of the offense or offenses.

---

"(3) A person convicted of a violation of Section 288 and who was a stranger to the child victim or made friends with the child victim for the purpose of committing an act in violation of Section 288, unless the defendant honestly and reasonably believed the victim was 14 years old or older.

"(4) A person who used a weapon during the commission of a violation of Section 288.

"(5) A person convicted of committing a violation of Section 288 and who has had a prior conviction of Section 261, 264.1, 267, 285, 288, or 289, of committing sodomy or oral copulation in violation of Section 286 or 288a by force, violence, duress, menace, or fear of immediate and unlawful bodily injury on the victim or another person, of assaulting another with intent to commit a crime specified in this paragraph in violation of Section 220, or a violation of Section 266.

"(6) A person convicted of kidnapping the child victim in violation of either Section 207 or 209 and who kidnapped the victim for the purpose of committing a violation of Section 288.

"(7) A person who is convicted of committing a violation of Section 288 on more than one victim at the same time or in the same course of conduct.

"(8) A person who in violating Section 288 has substantial sexual conduct with a victim under the age of 11 years.

"(9) A person who occupies a position of special trust and commits an act of substantial sexual conduct. 'Position of special trust' means that position occupied by a person in a position of authority who by reason of that position is able to exercise undue influence over the victim. Position of authority includes, but is not limited to, the position occupied by a natural parent, adoptive parent, stepparent, foster parent, relative, household member, adult youth leader, recreational director who is an adult, adult athletic manager, adult coach, teacher, counselor, religious leader, doctor, or employer.

"(10) A person who, in committing a violation of Section 288, used obscene matter, as defined in Section 311, or matter (as defined in Section 311) depicting sexual conduct, as defined in Section 311.3.

"(b) 'Substantial sexual conduct' means penetration of the vagina or rectum by the penis of the offender or by any foreign object, oral copulation, or masturbation of either the victim or the offender.

"(c) Paragraphs (7), (8), (9), and (10) of subdivision (a) shall not apply when the court makes all of the following findings: "(1) The defendant is the victim's natural parent, adoptive parent, stepparent, relative, or is a member of the victim's household who has lived in the household.

"(2) Imprisonment of the defendant is not in the best interest of the child.

## I. Statement of the Case

Defendant Thomas William Jeffers was charged with six counts of lewd and lascivious conduct upon the body of a child under the age of 14 years (§ 288, subd. (a)), with allegations that in the commission of each count except the third he engaged in substantial sexual conduct with a child under the age of 11 years (§ 1203.066, subd. (a)(8)). Jury trial resulted in verdicts finding defendant not guilty of counts 1 and 2 and guilty of counts 3 through 6. The special allegations were found to be true as to counts 4 through 6. Because it considered defendant statutorily ineligible for probation, the trial court denied probation and sentenced him to state prison for the middle term of six years on each count, the terms to be served concurrently. Defendant has appealed from the judgment.

## II. Statement of Facts

### A. Trial Evidence.

Defendant first met the victim, Cristina A., in 1976, while defendant was living in Ventura with his wife and their two teenage children. He was then self-employed as an electrical contractor, having previously worked as a harbor patrolman and as a police officer.

Cristina was born in 1975 and lived with her mother and grandmother. (Collectively we shall refer to these persons as Cristina's family.) Defendant's wife and Cristina's grandmother worked for the same employer and their friendship brought the two families together. In July 1980 Cristina's family lived in defendant's house with defendant's family for two weeks immediately before moving to Oregon. Defendant's family moved away from Ventura shortly thereafter.

---

"(3) Rehabilitation of the defendant is feasible in a recognized treatment program designed to deal with child molestation, and if the defendant is to remain in the household, a program that is specifically designed to deal with molestation within the family.

"(4) There is no threat of physical harm to the child victim if there is no imprisonment. The court upon making its findings pursuant to this subdivision is not precluded from sentencing the defendant to jail or prison, but retains the discretion not to. The court shall state its reasons on the record for whatever sentence it imposes on the defendant.

"The court shall order the psychiatrist or psychologist appointed pursuant to Section 288.1 to include a consideration of the factors specified in paragraphs (2), (3), and (4) in making his or her report to the court.

"(d) The existence of any fact which would make a person ineligible for probation under subdivision (a) shall be alleged in the accusatory pleading, and either admitted by the defendant in open court, or found to be true by the jury trying the issue of guilt or by the court where guilt is established by plea of guilty or nolo contendere or by trial by the court sitting without a jury."

This current version of section 1203.066 includes amendments subsequent to the date of the offenses in this case but the amendments are not material to the issues considered herein.

Cristina's family returned to Ventura in December 1980. Defendant's wife came back to Ventura in February or March of 1981 to deal with a problem involving the sale of defendant's house. She lived with Cristina's family in their apartment and was joined by defendant and his daughter in July 1981. This arrangement lasted only a few weeks until defendant moved with his family to a separate apartment.

In January 1982 defendant and his wife moved to Fullerton. In May 1982 Cristina's family followed and they lived in defendant's Fullerton house for more than six months, moving back to Ventura in December 1982. Defendant and his wife returned to Ventura in January 1983. The two families did not live under the same roof again but relations between the families continued to be cordial. Defendant had become a father-figure for Cristina. He had given her a bicycle and had taught her to ride it and had also taught her to swim.

In September 1983 Cristina's mother and grandmother were both working full-time and Cristina was attending third grade. At the end of the school day Cristina would go to a day care center where she would remain until her mother or grandmother came to get her. At the suggestion of the grandmother, and with the mother's approval, defendant would sometimes pick up Cristina from her school or from the day care center. This arrangement continued until January 12, 1984. Cristina had spent the afternoon of that day with defendant. In the evening her mother, acting on a hunch, asked Cristina if defendant ever made her do things she did not want to do. Cristina was reluctant to talk but eventually told her mother things which greatly alarmed her. Cristina's mother and grandmother took her to a hospital for examination and the matter was reported to the police. The examination revealed no evidence of molestation.

At the trial Cristina testified to a pattern of molestation by defendant over a period of at least several months and possibly longer, and she described the offenses of which defendant was convicted.

B. Presentence Report and Sentencing.

The presentence report noted that defendant had received psychological evaluations and had been found to be amenable to treatment. One psychologist had described him as a person who "was not a pedophile and does not present a danger to the community." Noting that the offenses were "almost incestuous in nature" and that defendant did "not appear to be a threat to the community at large," the report concluded that "state prison would serve no useful purpose for this 47-year-old individual who has no prior

record and appears to have only recently become involved in anti-social/sexual behavior." The probation officer recommended that probation be granted with one year in county jail, to be served in a work furlough program, and urged the court "to find that the defendant fits the criteria under Penal Code Section 1203.066(c)."

Attached to the presentence report was a letter written by the victim's mother urging that defendant not be allowed to "walk away with probation" and that he be given "a jail sentence." She wrote that Cristina had also expressed a wish that defendant "go to jail." When interviewed by the probation officer, the mother had said she did not want defendant to contact her daughter and never wanted to see him again.

Two expert witnesses testified for defendant at the sentencing hearing. They stated that defendant needed treatment, was amenable to treatment, could be rehabilitated, and would not pose a threat to Cristina or to any other child if not imprisoned. On the question of whether imprisonment of defendant would be harmful to Cristina, one of the experts, a clinical psychologist, said Cristina "might possibly have feelings of guilt or responsibility" if defendant was imprisoned. The other witness, a psychiatrist, stated that defendant and the victim had a "father/daughter type of relationship" and that "if the child were apprised of all of the situations, that the man is able to be rehabilitated . . . then I think that it would be very harmful if he went to prison in her eyes . . . ."

The prosecution offered no opposing testimony and conceded the feasibility of defendant's rehabilitation and the absence of threat of physical harm to Cristina if defendant was not imprisoned. The prosecutor argued, however, that defendant was not "a member of the victim's household who has lived in the household." The prosecutor conceded that defendant had lived in the victim's household but maintained that defendant's relationship with the victim and the victim's family at the time of the offense had not been sufficiently close to make him a household member.[2] In the course of his argument, the prosecutor stated: "I don't think the Court can make or at least should not make a finding that the defendant was a member of the victim's household because these acts for which he stands convicted took place almost a year after the living-together in Fullerton had ceased." The

[2] Between trial and sentencing the prosecution and the defense switched positions on the quality and frequency of the victim's contacts with defendant. The issue at trial being opportunity to commit the crime, the defense had attempted to minimize the relationship while the prosecution had attempted to show the opposite. In closing argument to the jury the prosecutor had stated: "What's the relationship between—or what was the relationship between Cristina A[ ] and Thomas Jeffers? He's the only father figure that she could recall, the person who was teaching her to swim, teaching her how to ride a bike, being that father figure."

prosecutor also argued that defendant's imprisonment would not be contrary to Cristina's best interests because there was no financial dependency and no likelihood of or need for any further contact between defendant and the victim or her family.

The court stated: " . . . I think I should make it clear that but for the legislative prohibition I think this would clearly be an appropriate case for probation." Explaining the nature of the prohibition, the court stated that it was undisputed there was sufficient evidence to establish the feasibility of defendant's rehabilitation and the absence of threat of physical harm to the victim. On the requirement that defendant's imprisonment be contrary to Cristina's best interest, the court stated: "I feel that a case can legitimately be made for its application in this case, although even that takes some degree of mental gymnastics." However, the court stated it was "incapable totally of concluding that the defendant fits the definition set forth in Paragraph 1" of subdivision (c) of section 1203.066. The court did not enlarge on why it was incapable of so concluding but it added: "I would hope it otherwise . . . . Lives are truly being shattered unnecessarily, but I don't make the law."

## C. The Court of Appeal Opinion.

The Court of Appeal, after a review of legislative history, reached the following conclusions: "We concur with Jeffers that 'household member who has lived in the household' is a catch-all category to allow the trial court discretion to grant probation to an offender who is a member of the victim's extended family—and we use that term in the broad sense—who has lived in the household. *However, the statutory language, 'is a member,' indicates that the offender must still occupy the role of family member at the time the court considers probation eligibility.* In other words, instead of focusing on when the offender lived in the household, the trial court should focus on whether the offender is a part of the extended family unit. [¶] In the instant case the record indicates that, while [defendant and the victim] may have had a warm and caring relationship prior to the abuse, *he was not a member of her 'household' or extended family at time of sentencing. . . .*" (Italics added, original italics deleted.) Having concluded that defendant was not eligible for probation, the Court of Appeal affirmed the judgment.

## III. DISCUSSION

## A. "A Member of the Victim's Household."

■ The statutory language imposes two separate requirements. The defendant must be a person who "is a member of the victim's household"

and a person who "has lived in the household." The class of persons who are *members* of the victim's household must be broader than the class of persons who *have lived* in the household because otherwise the latter requirement would be superfluous and a construction making some words surplusage is to be avoided. (*White* v. *County of Sacramento* (1982) 31 Cal.3d 676, 681 [183 Cal.Rptr. 520, 646 P.2d 191].) In other words, it must be possible to be a member of the victim's household even though one is not at the same time living in that household.

As construed by the Court of Appeal, "living in the household" denotes physical presence under a common roof whereas being a "member of the . . . household" denotes a quality of relationship. Being a household member refers not only to the relationships among members of a family, but also to the bonds which may be found among unrelated persons adopting nontraditional and quasi-familial living arrangements. Thus a member of the victim's household is one who has this quality of relationship with the victim. These rough definitions are accepted by the parties to this appeal, are supported by the legislative history of section 1203.066 discussed below, and we agree with them.[3]

B. ▮▮▮ Does "Is a Member of the Victim's Household" Mean at the Time of the Offense or at the Time of Sentencing?

The statute's use of two verb tenses (i.e., "is a member" and "has lived") indicates that two time periods are involved. The time during which the defendant "lived in the household" may precede the time when the defendant is required to be a member of the victim's household.

Because subdivision (c) of section 1203.066 is to be applied by the court at the sentencing hearing, it does not seem unreasonable on its face to interpret the verb "is" as referring to that time. In other parts of the subdivision, "is" seems clearly to refer to the time of sentencing—for example, the requirement that rehabilitation of the defendant "is feasible."

On the other hand, the Legislature has not been entirely consistent in its use of verb tenses in probation eligibility statutes. It has used both present and past tenses to refer to the time of the offense. Section 1203, for example, contains a list of persons to whom probation may be granted only in unusual cases. The list includes "[a]ny person who knowingly furnishes or gives away phencyclidine" (subd. (e)(8)) as well as "[a]ny person who used or attempted to use a deadly weapon . . ." (subd. (e)(2)). Section 1203.055

---

[3] We note that recently enacted Code of Civil Procedure section 340.1 uses and defines the term "household or family member" in the context of a statute of limitations for certain civil actions but the definition is expressly limited to the term as used in that section.

uses the phrase "a person convicted of committing . . . one or more of the offenses listed in subdivision (b) against a person who *is* a passenger, opera- tor, driver, or other occupant of any public transit vehicle . . . ." (Italics supplied.) Construing the verb "is" in this phrase as meaning anything other than the time of the offense would clearly be absurd, even though it appears in a sentencing provision.

The same mixing of tenses appears in section 1203.066. Included in the classes of defendants affected are those who "caused bodily injury" (subd. (a)(2)) or "used a weapon" (subd. (a)(4)) and also one who *"occupies* a position of special trust and *commits* an act of substantial sexual conduct" (subd. (a)(9), italics added). The use of the present tense in subdivision (a)(9) is particularly noteworthy because subdivisions (a)(9) and (c)(1) are the only parts of section 1203.066 which refer to the status of being a household member. Use of the present tense in subdivision (a)(9) to refer to the time of the offense raises at least a possibility, if not a probability, that the same meaning (i.e., the time of the offense) was intended in respect to "is a member of the victim's household" in subdivision (c)(1).

In light of the inconsistent use of verb tenses in probation eligibility provisions generally, and the use of the present tense in subdivision (a)(9) of section 1203.066 to refer to the time of the offense, the verb "is" in the phrase "is a member of the victim's household" could refer either to the time of the offense or to the time of sentencing.

■ "When questions as to the applicability or interpretation of statutes are presented to this court, numerous cases have recognized that the con- trolling issue is the intent of the Legislature." (*Milligan* v. *City of Laguna Beach* (1983) 34 Cal.3d 829, 831 [196 Cal.Rptr. 38, 670 P.2d 1121]; see also *White* v. *County of Sacramento, supra,* 31 Cal.3d at p. 681.) The legislative history of the statute as well as the historical circumstances of its enactment may be considered in determining the intent of the Legislature. (*People* v. *Black* (1982) 32 Cal.3d 1, 5 [184 Cal.Rptr. 454, 648 P.2d 104].) Thus we shall look beyond the statute's language and inquire into its history for the purpose of ascertaining legislative intent.

The Joint Committee for Revision of the Penal Code (1979-1980 Reg. Sess., hereafter Joint Committee) held a hearing on December 16, 1980. The announced purpose of the hearing was "to examine the complex problem of child sexual abuse in California and to determine if the State of California is doing everything within its power to handle all facets of the problem with maximum effectiveness." (Hearing on Child Molestation by Joint Com. (Dec. 16, 1980) p. 1.) Witnesses testifying at the hearing included police officers, psychologists, deputy district attorneys, victims of sex offenses, and

leaders of organizations concerned with the problem of sex offenses against children.

Several of the witnesses drew a distinction between offenses of pedophilia and incestuous or intrafamily offenses.[4] (*Id.,* at pp. 31, 139, 162, 167-168, 172.) A pedophile or fixated offender was defined as a man (there are virtually no female pedophiles) who throughout life is sexually attracted exclusively to children, usually boys, within a particular age range.[5] (*Id.,* at pp. 150-151.) Incestuous or intrafamily offenses are committed by regressed offenders, men who are sexually attracted to adult women but who, for a variety of reasons, have engaged in sexual relations with a child, usually a girl. (*Id.,* at pp. 151-153.)

The Joint Committee was told that attempts to treat and rehabilitate pedophiles have been unsuccessful and that mandatory prison terms are appropriate for this group of offenders. (*Id.,* at pp. 49, 151, 162-163.) Regressed offenders, on the other hand, have been successfully rehabilitated and mandatory prison terms are not necessary for protection of the community. (*Id.,* at pp. 152-153, 163-164, 173.) Successful treatment of the regressed or intrafamily offender requires that he be prosecuted and receive punishment in some form, such as a jail term (*id.,* at p. 153) but mandatory prison terms are undesirable "because more of the witnesses would be reluctant to give the kind of testimony that would put their companion, their father, or . . . their 'beloved friend' in prison." (*Id.,* at p. 156. See also, p. 164.)

Following this hearing, Senate Bill No. 586 (1979-1980 Reg. Sess.) was introduced with a proposed section 296 dealing with the subject of mandatory prison terms for persons committing sex offenses against children. (1 Sen. J. (Mar. 16, 1981) p. 654.) The mandatory provision would not apply if the court made four findings. Relevant to this appeal are the terms of the first two required findings: "(1) The defendant is the victim's natural parent, adoptive parent, stepparent, relative or member of the victim's household" and "(2) Imprisonment of the defendant would either cause psychological harm to the child, or cause the breakup of the family, or both."

The Joint Committee held hearings on Senate Bill No. 586, and on the other five bills in the reform package, on April 10 and 24 of 1981. Much of

---

[4] The hearing testimony is cited not to endorse the views stated but only to present them for whatever light they may shed on legislative intent. We recognize that in this area few propositions have been proved with scientific rigor and that further development in the knowledge and opinions of the experts is likely.

[5] The typical pedophile does not use force against the child victim and relatively few of these offenses are reported. (Hearing on Child Molestation by Joint Com., *supra,* pp. 3, 5, 26, 119, 150.)

the testimony related to the issue of mandatory prison sentencing. Witnesses remarked that a victim of an intrafamily molestation often feels guilt and responsibility for breaking up the family if the perpetrator is sentenced to prison. (Hearings on Child Molestation Legislation (hereafter Hearings) Hg. of Apr. 10, 1981, pp. 29-30, 51.) A victim who had been molested by her stepfather testified that at first she had wanted him incarcerated but later she had changed her mind and would have felt guilty if her stepfather had been imprisoned. (Hg. of Apr. 24, 1981, p. 47.)

If an intrafamily molester is imprisoned there could be a loss of financial support for the family, the victim could be blamed by other family members, and the victim's mother might abandon the victim in favor of the molester.[6] If a prison sentence is mandatory, there could also be a reluctance of prosecuting authorities to file charges, knowing the consequences for the family. The authorities might prefer to treat the problem as a juvenile or family law matter rather than as a criminal matter, even though criminal prosecution, without a mandatory prison term, would be preferable. (Hg. of Apr. 24, 1981, pp. 56-57.) Effective rehabilitation is more difficult in prison because the other family members cannot participate. (*Id.,* at pp. 60-61.)

Concern was expressed regarding the difficulty of formulating a legal definition of intrafamily molesters.[7] Another participant said he was concerned that the definition proposed in Senate Bill No. 586 (including any "member of the victim's household") was too broad, a "loophole that you could drive a truck through, possibly." (Hg. of Apr. 24, 1981, p. 24.) A witness representing Parents United, a treatment program for intrafamily molesters, spoke in favor of a broad statutory definition.[8] Transcripts of the

---

[6] "[W]hen a stranger sexually attacks a child, separating that stranger both from the child and from society is a good solution. But, when the person who molests the child is the father, then the separation brings about a number of complications, often the loss of support for the family, often the blaming of the victim that goes on among other members. The mother may abandon the child if she thinks she has to choose between the child and the father, and so on." (Hg. of Apr. 24, 1981, pp. 8-9.)

"[W]hen the father is removed and imprisoned for this, very often, the mother turns against the child. 'You put daddy in prison.' There is the loss of support, you know, the breadwinner of the family. It may lead to not just a breakup of the family as it has been known, but the child then will often come . . . and beg us to do something to get the father back because everyone has disowned her at this point. . . . And I think our approach is, if it is possible to have treatment in this case, and to maintain the integrity of the family, it would be the most productive for all involved." (*Id.,* at p. 22.)

[7] "We have people like ex-boyfriends, or the boyfriend that hasn't moved in with mother, but is playing the role of the surrogate father. We have the next door neighbor, and the little child becomes the extra child in that family because her own parents ignore her. And that same kind of damage is [done] to that child. She sees that man as that father figure." (Hg. of Apr. 10, 1981, p. 51.)

[8] ". . . I understand that feeling about distinguishing the father from the rest of the molesters who turn out to know the child. The distinction that we want to draw in our society is

hearings were to be prepared "for the review of others who will be analyzing and voting upon these bills." (*Id.,* at p. 107.)

Senate Bill No. 586 was passed by the Senate on June 15, 1981, and sent to the Assembly. (2 Sen. J. (1980-1981 Reg. Sess.) p. 3309.) On August 10, 1981, subdivision (b)(l) of the proposed section 296 was amended to read: "The defendant is the victim's natural parent, adoptive parent, stepparent, relative, or is a member of the victim's household who has lived in the household for a substantial period of time but not less than one continuous year, while assuming the role as parent." Subdivision (b)(2) of proposed section 296 was amended to read: "Imprisonment of the defendant is not in the best interest of the child." (4 Assem. J. (1980-1981 Reg. Sess.) amend. Aug. 10, 1981, p. 6342.)

The bill was again amended on August 25. The proposed section 296 was deleted and its provisions inserted into section 1203.065. The language of subdivision (e)(l) of that section read: "The defendant is a member of the victim's immediate family including parent, grandparent, aunt, uncle, brother or sister, or is a step-parent, adopted parent, or has been living in the household for a substantial period of time but not less than one continuous year, while assuming the role as a parent." Returning to the earlier language, subdivision (e)(2) stated: "Imprisonment of the defendant would either cause psychological harm to the child, or cause breakup of the family, or both." (4 Assem. J. (1980-1981 Reg. Sess.) p. 6998.) In this form the bill passed the Assembly and was sent to the Senate. (4 Assem. J. (1980-1981 Reg. Sess.) p. 7830.)

The Senate refused to concur in the Assembly amendments. (4 Sen. J. (1980-1981 Reg. Sess.) p. 6337.) The final form of the bill was drafted by the conference committee. The provisions in question were moved from section 1203.065 to section 1203.066 and given their current wording. The bill passed both houses on September 15. (4 Sen. J. (1980-1981 Reg. Sess.) p. 6613; 5 Assem. J. (1980-1981 Reg. Sess.) p. 8539.)

The language of subdivision (c)(l) is narrower than the initial Senate version but broader than the version first passed by the Assembly and

---

what kind of relationship that child feels she has with that man. If that man has been her stepfather since she was one year old, it doesn't make any difference to her that he is a stepfather, [rather] than a real father. He's her father figure. And her response to what she does, when she goes ahead and reports this, and how she feels about the molest is the same. And it is on that basis that we wanted to have all in-family members mentioned within that when there is a case.

"We have had two cases where pedophiles have married women in order to get to their children. That also was very clear, very quickly . . . . [¶] In theory, sometimes it's difficult to distinguish often the pedophile from the in-family molester. But, in practice, it is really very easy." (Hg. of Apr. 24, 1981, p. 30.)

appears to be the result of a compromise. The requirement that the defendant have lived in the household, not found in the original Senate version, was apparently intended to exclude neighbors, teachers, babysitters, and others who might, on the basis of a close relationship with the victim, claim to be household members. On the other hand, the final version does not require that the defendant have lived in the household for a substantial period of time or that he have done so "while assuming the role as parent" and it rejected the phrase "member of the victim's immediate family" in favor of the earlier version, "member of the victim's household."

■ Statutes should be construed to produce a reasonable result consistent with the legislative purpose. (*Cossack* v. *City of Los Angeles* (1974) 11 Cal.3d 726, 732-733 [114 Cal.Rptr. 460, 523 P.2d 260].) The object to be achieved and the evil to be prevented are prime considerations in determining legislative intent. (*Judson Steel Corp.* v. *Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 669 [150 Cal.Rptr. 250, 586 P.2d 564].)

■ The provisions of section 1203.066 should be construed in light of the major areas of concern expressed at the legislative hearings, one of which was that a child victim often suffers guilt feelings if a nonviolent molester who has been a father figure for that child is imprisoned. According to witnesses expressing this concern, the child feels responsible, albeit irrationally, for betraying a relationship of trust. The likelihood of this occurring would seem to depend directly on the strength of the relationship between the victim and the defendant at the time of the offense and at the time of the "betrayal" (i.e., when the victim first reported the offense). The strength of the relationship at the time of sentencing would appear to be a less relevant consideration.[9]

Concern was also expressed at the hearings that a distinction be drawn, for purposes of probation eligibility, between those described as intrafamily or "regressed" offenders, who stand some chance of rehabilitation, and the pedophiles or "fixated" offenders, who were considered not amenable to treatment and a greater threat to the community. An intrafamily offender being, by definition, one who committed the offense while within the family or household unit, the defendant's relationship with the victim at the time of the offense is more relevant for the purpose of identifying intrafamily offenders than the relationship at the time of sentencing.

It could be argued that the victim is most likely to experience destructive guilt feelings if the defendant was a member of the victim's household *both*

---

[9] In this case the child is reported to have said she wished the defendant would "go to jail." While certainly relevant, this evidence does not conclusively establish that she would not suffer long-term guilt feelings if defendant were imprisoned.

at the time of the offense *and* at the time of sentencing and, similarly, that defendants who are members of the victim's household at both of these times are most likely to be intrafamily offenders and hence amenable to treatment. But the statute clearly requires a determination of household member status at one time or the other, not at two different times. Thus the proper question is which of the two times is most relevant in light of the legislative purpose.

Not only is the time of the offense more relevant in terms of these legislative concerns, but fixing the crucial time for determining eligibility for probation as the time of sentencing would import into the eligibility determination a number of irrelevant and extraneous factors and considerations. A defendant with a close relationship to the victim at the time of the offense might have no relationship with the victim at the time of sentencing for reasons having little or nothing to do with the defendant's dangerousness, the likelihood of rehabilitation, the victim's welfare, or any other pertinent consideration. Such reasons would include the defendant's inability to make bail, delays in bringing the case to trial, and the victim's having moved away from the area.

Interpreting the statute to require determination of household member status as of the time of sentencing would require or at least encourage the defendant to maintain a relationship with the victim and the other members of the victim's family after the offense and up to the time of sentencing when a severing of the relationship during this period by the defendant, out of concern for the victim's feelings or in recognition of his own need for rehabilitation, might better serve the interests of both the victim and the defendant. If the relationship at the time of sentencing is a critical factor, a defendant may attempt to maintain a close relationship with the victim even though there is a high level of friction. A victim's mother or guardian, knowing the importance to the defendant, might be too fearful of or solicitous for the defendant to sever the relationship or, conversely, might break with the defendant precisely to ensure ineligibility for probation. In short, decisions which should be based on other considerations might well be heavily influenced by the question of eligibility for probation, possibly to the detriment of the victim.

We are reluctant to attribute to the Legislature an intent to permit eligibility for probation to be determined by the operation of such extraneous factors. ■ Courts are reluctant to attribute to the Legislature an intent to create "an illogical or confusing scheme" (*Landrum* v. *Superior Court* (1981) 30 Cal.3d 1, 9 [177 Cal.Rptr. 325, 634 P.2d 352]); legislative policy is best effectuated by avoiding those constructions which lead to mischief or

absurdity (*People* v. *Aston* (1985) 39 Cal.3d 481, 492 [216 Cal.Rptr. 771, 703 P.2d 111]).

 A prime example of the mischief or absurdity which could result from interpreting "is" in subdivision (c)(1) of section 1203.066 to refer to the time of sentencing is the incentive that would be given the victim's mother and a boyfriend offender to marry after the time of the offense, or even after his conviction, but before the date of sentencing. Under the interpretation proposed by the Court of Appeal, such a defendant would be eligible for probation under subdivision (c)(1) as a stepparent of the victim even though he had never lived in the victim's household and therefore was ineligible for probation when the offense was committed. We are unable to conclude that the Legislature intended such a result.

It is argued by the Attorney General that the Legislature provided an exception to the general rule of probation ineligibility for child molesters primarily to prevent disruption of the relationships within the victim's household, particularly where the victim's mother is emotionally or financially dependent on the defendant, because imprisonment under these circumstances would be likely to cause financial hardship for the victim or the blaming of the victim by other household members, and that for this purpose the most relevant time for assessing the defendant's relationship with the victim would be the time of sentencing.

While this was undoubtedly one of the areas of legislative concern, nothing in the statutory language or the legislative history persuades us that this was the exclusive or overriding purpose of the probation eligibility provisions. Although these concerns do relate to conditions existing at the time of sentencing, they have been directly addressed by the required finding under subdivision (c)(2) of section 1203.066 that imprisonment is "not in the best interest of the child." As first proposed, subdivision (c)(2) would have required a finding that "[i]mprisonment of the defendant would either cause psychological harm to the child, or cause the breakup of the family, or both." The replacement of this language with the broader language finally adopted shows not only that subdivision (c)(2) encompasses the problems of financial and emotional dependency and the blaming of the victim by other family members, but also that the Legislature intended to permit a finding of eligibility for probation in cases where these particular problems do not exist but there is some other basis for concluding that imprisonment of the defendant would not be in the child's best interest. The concerns mentioned by the Attorney General having been recognized and addressed in subdivision (c)(2), we believe subdivision (c)(1) should be construed in a manner which best addresses the other areas of legislative concern discussed above, and which minimizes the risk that eligibility for

probation will be determined by the play of extraneous factors. For these reasons, the construction urged by the Attorney General is a less satisfactory solution to the difficult problem of statutory construction posed in this case.

These considerations lead us to conclude that an interpretation of the statute requiring household-member status at the time of the offenses is more consistent with probable legislative intent than an interpretation requiring household-member status at the time of sentencing.

The statute contains adequate safeguards to prevent a grant of probation to an undeserving defendant. Probation is absolutely prohibited to a defendant who, for example, used force (§ 1203.066, subd. (a)(1)) or who made friends with the child for the purpose of committing an act of molestation (§ 1203.066, subd. (a)(3)). Before probation can be granted, there must be a finding that rehabilitation is feasible and the testimony at the legislative hearings indicated that this requirement cannot be met if the defendant is a pedophile or "fixated offender." The court must also find that imprisonment of the defendant would not be in the best interest of the child. When all these findings are made, the court has determined only that the defendant is *eligible* for probation. Thereafter the court must exercise its discretion, as it must do whenever an eligible defendant applies for probation, to determine whether probation is *appropriate* under the particular circumstances of the case.

## IV. DISPOSITION

In this case the evidence on the question of whether defendant was a member of the victim's household at the time of the offenses was not conclusive. Defendant and the victim had not lived under the same roof for a year or so and the frequency and quality of their contacts in the months preceding the offenses was the subject of conflicting testimony. Exercising its fact-finding power, the sentencing court could properly have made a finding under subdivision (c)(1) of section 1203.066 either for or against probation eligibility.

■ It is generally presumed that a trial court has followed established law (*Ross* v. *Superior Court* (1977) 19 Cal.3d 899, 913 [141 Cal.Rptr. 133, 569 P.2d 727]), but this presumption does not apply where the law in question was unclear or uncertain when the lower court acted (*People* v. *Chambers* (1982) 136 Cal.App.3d 444, 457 [186 Cal.Rptr. 306]; *In re Fred J.* (1979) 89 Cal.App.3d 168, 175 [152 Cal.Rptr. 327]; see also *People* v. *Collins* (1986) 42 Cal.3d 378, 389, fn. 9 [228 Cal.Rptr. 899, 722 P.2d 173]).

■ Given the ambiguity of the statutory language in question, and the lack of any authoritative construction, there is a substantial likelihood the trial court relied on an incorrect interpretation of the provision in question. The court's remark that it was "incapable totally" of finding eligibility under section 1203.066, subdivision (c)(1), if interpreted to mean the evidence would not *permit* a finding of eligibility, confirms the existence of a misunderstanding. Accordingly, we decline to apply the presumption and the matter will be remanded to permit a fresh consideration of the issues in light of this opinion.

The judgment of the Court of Appeal is reversed with directions to remand the cause to the trial court for resentencing.

Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., Arguelles, J., and ·Eagleson, J., concurred.