Filed 3/8/23  P. v. Lemus CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>OSCAR LEMUS,<br><br>    Defendant and Appellant. | G060693<br><br>(Super. Ct. No. 95WF0774)<br><br>O P I N I O N |

Appeal from a postjudgment order of the Superior Court of Orange County, Steven D. Bromberg, Judge.  Affirmed.

Spolin Law and Aaron Spolin for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Eric A. Swenson, Alan L. Amann and Junishi P. Semitsu, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and Petitioner Oscar Lemus appeals from a postjudgment order denying his petition for resentencing under former Penal Code section 1170.95.[1] Although the trial court used the wrong standard to consider the petition, we conclude the error is harmless beyond a reasonable doubt and therefore affirm the postjudgment order.

STATEMENT OF FACTS AND PROCEDURAL HISTORY

On appeal from the jury's verdict, another panel of this court set forth the relevant facts as follows:  "In the early morning hours of Sunday, March 12, 1995, Dannette Garrett, a nighttime attendant at a 24-hour Arco gas station located on Pacific Coast Highway in Seal Beach, California, was shot to death in the station's second-floor office.  Several items were missing from the station, including batteries, condoms, sunflower seeds and cash.  At the top of the stairs leading to the office appeared graffiti, including the word 'Whites' with a line crossed through it, plus '20 Crips ICG, Long Beach Crip, LBC, Insane Crip Gang.'

"The graffiti terms '20 Crips' and 'ICG' are references to two African-American gangs in Long Beach known as the Rolling 20's and the Insane Crip Gang.  A gang expert opined that since these two gangs are rivals, one would not see graffiti with their names appearing next to each other.  The word 'Whites' with a line through it indicated dislike for White people.  African-American gangs rarely write such graffiti.  The expert concluded someone wrote the graffiti to make it appear as if the African-American gangs committed the crimes, thereby placing them in a bad light.

---

[1]  All further statutory references are to the Penal Code, unless otherwise noted.

Lemus's petition was filed under former section 1170.95.  Effective June 30, 2022, former section 1170.95 was renumbered as section 1172.6, with no change in text.  (Stats. 2022, ch. 58, § 10.)  For purposes of clarity, we will refer to the statute as former section 1170.95 throughout this opinion.

"The Eastside Longos (ESL) is an Hispanic street gang in Long Beach. Its territory overlaps that of the Rolling 20's and the Insane Crip Gang. ESL has had problems with both African-American gangs over drug dealing.

"An investigation of the crime scene uncovered a fingerprint match for Mario Ortiz. He and defendant are ESL members. Defendant admitted initiating Mario into the gang. Jose Ortiz, Mario's brother, saw Mario with a handgun two weeks before Garrett's murder. Mario did not come home the night of March 11. When Mario arrived home on Sunday, he was carrying condoms and appeared nervous. Jose also saw batteries in a drawer with the condoms. Mario showed Jose a newspaper article about the murder. The police discovered condoms, batteries and newspaper articles about the murder during a subsequent search of his home.

"Layla, a 16-year old, testified she was dating defendant in March 1995. At that time, Mario was dating Elizabeth, Layla's cousin. About 10:30 on a weekend evening in early March, the two couples went for a ride in defendant's car. They drove around for one or two hours before stopping at the beach. They remained at the beach for several hours. During this time, Mario gave defendant a handgun which defendant placed inside the cushion of the front passenger seat.

"The group left the beach and, after driving around for awhile, stopped at an Arco gas station on Pacific Coast Highway. Layla saw the rear side of what appeared to be either a motor home or camper shell parked nearby. A customer of the Arco station where Garrett worked testified he left his motor home along the side of the station on Saturday, March 11 and did not retrieve it until the following Wednesday.

"Both defendant and Mario left the car. Before defendant left, Layla saw him reach into the seat cushion where he had previously placed the gun, but gave equivocal testimony about whether she saw a gun in his hand.

"Mario returned after a few minutes with a soft drink. He told Layla and Elizabeth the station's rest rooms were closed. Mario left again, meeting defendant by

the station's gas pumps. The two went in separate directions with defendant walking along the side of the building closest to the car. When defendant returned to the car he opened the trunk. Layla could not see what was happening, but heard what sounded like boxes being moved. When the trunk was closed, Layla saw both defendant and Mario standing to the rear of the car. The group then quickly left the station and drove home. On direct examination, Layla testified she saw sunflower seeds on the seat after they left the station, but later testified she was not certain about this fact.

"After his initial arrest, the police gave defendant the advisement required by *Miranda v. Arizona* (1966) 384 U.S. 436 and he agreed to speak. When informed he had been arrested for a murder in Seal Beach, defendant replied, 'Oh, okay.' He admitted being in Seal Beach with Mario and two females several weeks earlier, but he denied going to an Arco station. The police found a handgun in defendant's residence which was later determined not to be the murder weapon. When shown to defendant, he replied, 'That's not the gun.' The police falsely told defendant they had found his fingerprints at the station and that Mario had said they were partners in committing the crimes. He grimaced and appeared perplexed and disturbed. Although released from custody, the police rearrested defendant on April 12. The police searched his car and discovered a secret compartment in the lower part of the front passenger seat.

"During his pretrial incarceration, defendant contacted Jose by telephone. Defendant said he had read the police reports. He asked Jose to contact Layla and Elizabeth, and if he discovered they had snitched, 'jump' them. Defendant also accused Jose of snitching and sent others who threatened to kill Jose if he testified." (*People v. Lemus* (Dec. 18, 1997, G018947) [nonpub. opn.]).

The jury found Lemus guilty of first degree murder (§ 187, subd. (a)) and robbery (§§ 211, 212.5). The jury found true a special circumstance allegation under section 190.2, former subdivision (a)(17)(I). The jury also found true allegations Lemus personally used a firearm in the commission of both crimes. (Former § 12022.5,

4

subd. (a)(1).) Lemus filed an appeal from the judgment, arguing, in part, there was not substantial evidence he was the perpetrator of the crimes. Another panel of this court rejected Lemus's argument and affirmed the judgment.

In December 2020, Lemus filed a petition for resentencing under former section 1170.95. The People conceded Lemus had made a prima facie showing for relief but objected to resentencing. The trial court issued an order to show cause why relief should not be granted to Lemus.

Following briefing and an evidentiary hearing[2] in August 2021, the trial court found Lemus was the actual killer or, in the alternative, he was a major participant in the commission of the murder, and therefore denied the petition for resentencing. The trial court's minute order reads, in relevant part, as follows:

"The jury found it to be true as to Lemus that the Special Circumstance exists, to-wit: Murder while engaged in the Commission or Attempted commission of Robbery as alleged In the Information. [¶] Additionally, of significance, the jury also found it to be true as to Lemus that he personally used a firearm, to wit: a handgun, during the commission of the Murder in the First Degree. [¶] . . . [¶] In the alternative, the factors that support a finding that Lemus was a Major Participant with Reckless Indifference to Human Life are many. [¶] Lemus was actively and substantially involved in the events leading up to the murder. *The evidence at trial as to this issue was*

---

[2] The prosecution did not call any witnesses or introduce any new evidence at the hearing. The trial court considered the trial record, including the trial transcript, the Court of Appeal decision, the jury instructions, the verdicts, and the jury's findings. We recognize that since the evidentiary hearing in this matter, a Court of Appeal has held, "the factual summary in an appellate opinion is not evidence that may be considered at an evidentiary hearing to determine a petitioner's eligibility for resentencing." (*People v. Flores* (2022) 76 Cal.App.5th 974, 988, citing former Pen. Code § 1170.95, subd. (d)(3).) Ignoring the opinion in the underlying case, the evidence within the actual trial court record was more than sufficient to support the findings regarding Lemus's resentencing petition.

*substantial*. Lemus had a role in planning the criminal conduct that led to a murder. Again, *the evidence at trial was strong*. Lemus had possession and control of a gun when he placed it in the hidden area of sorts of his vehicle as well as removing it at the Arco station. [¶] . . . [¶] Additionally, again, *the evidence at trial was substantial that Lemus was present at the scene of the murder*. . . . [¶] The evidence reflects that Lemus was in a strong position to facilitate or in the alternative, prevent the actual murder. [¶] . . . [¶] The evidence at trial supports a finding that Lemus' actions played a role in the murder. [¶] Additionally, inasmuch as Lemus took control of a firearm given to him by [Mario] Ortiz, he knew that his conduct would result in reckless indifference to human life and as such, he knew that a lethal weapon was likely to be used at that time. Lemus had ample opportunity to stop the killing and it is clear that Lemus did not attempt to render aid to the victim after lethal force was used. Further, Lemus took no action to minimize the risks of violence in the commission of the robbery. *The evidence at trial was substantial*." (Italics added.)

Lemus filed a timely notice of appeal.

## DISCUSSION

Lemus contends the trial court erred by denying relief without articulating the standard it was using.[3]

During the evidentiary hearing on the former section 1170.95 motion, both parties stated on the record the People "must prove beyond a reasonable doubt that the defendant could be convicted of first or second degree murder under the new changes in the law." Neither in the transcript of the evidentiary hearing nor in the written order did the trial court address the standard of proof.

---

[3] Lemus also contends the trial court erred by failing to make express findings as to the required elements for a felony-murder conviction. The trial court's minute order contains all necessary findings.

6

When there is no question as to the applicable standard of proof, the trial court need not articulate the standard and it is presumed the trial court applied the correct standard. (See Evid. Code, § 664; *Peake v. Underwood* (2014) 227 Cal.App.4th 428, 447.) That presumption does not apply, however, "where the law in question was unclear or uncertain when the lower court acted [citations]." (*People v. Jeffers* (1987) 43 Cal.3d 984, 1000; see *People v. Fuhrman* (1997) 16 Cal.4th 930, 945 [presumption not relied upon where appellate court decisions were in conflict and the appellate record was silent].)

At the time of the evidentiary hearing in August 2021, there was a split among the courts of appeal as to the standard by which the trial courts should review the evidence to determine if a petitioner was entitled to relief under former section 1170.95. One view was "the prosecution must therefore prove beyond a reasonable doubt that the defendant *could* still have been convicted of murder under the new law—in other words, that a reasonable jury could find the defendant guilty of murder with the requisite mental state for that degree of murder." (*People v. Duke* (2020) 55 Cal.App.5th 113, 123, revd. *People v. Duke* (Nov. 23, 2021, S265309) 2021 Cal. Lexis 8141.) The other view was "the prosecutor [must] prove beyond a reasonable doubt each element of first or second degree murder under current law in order to establish ineligibility based on the third condition." (*People v. Lopez* (2020) 56 Cal.App.5th 936, 949, revd. *People v. Lopez* (Dec. 22, 2021, S265974) 2021 Cal. Lexis 8775.) The question was resolved by an amendment to the statute adding: "A finding that there is substantial evidence to support a conviction for murder, attempted murder, or manslaughter is insufficient to prove, beyond a reasonable doubt, that the petitioner is ineligible for resentencing." (Former § 1170.95, subd. (d)(3); Stats. 2021, ch. 551; see *People v. Owens* (2022) 78 Cal.App.5th 1015, 1022.)

7

Because the issue of the standard to be employed by the court was unresolved at the time, and the trial court referred multiple times to substantial evidence, we conclude the trial court erred in the standard it applied to its review of the evidence.

The Attorney General contends any error by the trial court was harmless because the People proved beyond a reasonable doubt Lemus was either the actual killer or a major participant in the crime who acted with reckless indifference.[4] We have found no published case addressing whether the standard of prejudicial error set forth in *Chapman v. California* (1967) 386 U.S. 18, 24 (*Chapman*), or *People v. Watson* (1956) 46 Cal.2d 818, 836 (*Watson*), should be applied here.

The court in *People v. Garrison* concluded, whether evaluating under the standard of prejudicial error set forth in *Chapman* or *Watson*, the error in using the wrong standard of proof was harmless. (*People v. Garrison, supra,* 73 Cal.App.5th at p. 747.) In that case, the defendant had admitted he personally used a handgun in the course of the murder; that the defendant was the actual killer was "the *only* conclusion consistent with [the] admission." (*Ibid.*)

In this case, the trial court's error in applying the wrong standard at the resentencing hearing was harmless under either *Chapman* or *Watson*. Lemus's girlfriend Layla testified Mario Ortiz and Lemus had one gun when they entered the gas station store. The jury in Lemus's case found Lemus personally used a firearm in the commission of the murder. Three shots were fired from the same gun, and those were the three shots that killed the victim. The evidence showed Lemus was the actual killer and therefore not entitled to resentencing under former section 1170.95.

Alternatively, as the trial court found, if Lemus was not the actual killer, he was a major participant in the robbery who acted with reckless indifference to human life.

---

[4] The application of the wrong standard of proof at a resentencing hearing is not structural error requiring automatic reversal because a former section 1170.95 hearing is not a criminal trial. (*People v. Garrison* (2021) 73 Cal.App.5th 735, 745-746.)

Lemus was actively and substantially involved in the events leading to the murder, and had a role in planning the crime of robbery that led to the murder. Lemus had possession and control of the gun and was present when the murder occurred. If Lemus was not the actual shooter, then he handed the gun to Mario Ortiz in the store, meaning Lemus knew a lethal weapon was likely to be used and he "was in a strong position to facilitate or in the alternative, prevent the actual murder." Lemus had the opportunity to stop the killing, failed to render aid to the victim after the shooting, and took no action to minimize the risks of violence during the commission of the robbery. (*People v. Strong* (2022) 13 Cal.5th 698, 705-706.)

Finally, the original trial record, which was before the trial court on the former section 1170.95 hearing, showed the following: (1) When the police showed Lemus a gun obtained from Mario Ortiz's house, he stated "'That's not the gun.'" (2) While in jail before trial, Lemus told Jose Ortiz to physically assault anyone who might be snitching on him. (3) The forensic evidence showed the victim was shot in the back twice while on the ground in the second floor office, demonstrating the murder was not an act of self-defense, a crime of passion, or an accident.

Under either the *Chapman* or the *Watson* standard, the trial court's error was harmless.

DISPOSITION

The postjudgment order is affirmed.


MOTOIKE, J.

WE CONCUR:


BEDSWORTH, ACTING P. J.


DELANEY, J.