118 Cal.Rptr.2d 81 (2002)
96 Cal.App.4th 1333
Allen HASSAN, Plaintiff and Appellant,
v.
MERCY AMERICAN RIVER HOSPITAL, Defendant and Respondent.
No. C026448.
Court of Appeal, Third District.
March 21, 2002.
Review Granted July 17, 2002.
*83 The Advani Law Firm, Kelly, Herlihy, Advani & Klein, Mukesh Advani, Jerry Schreibstein, San Francisco; The Schinner Law Group, Mukesh Advani for Plaintiff and Appellant.
Diepenbrock, Wulff, Plant & Hannegan, Charity Kenyon, Sean O. Sheridan, John A. Bachman; Riegels, Campos & Kenyon, Charity Kenyon, Sacramento, for Defendant and Respondent.
*82 BLEASE, Acting P.J.
This is an appeal from a summary judgment granted Mercy American River Hospital (Mercy) in Dr. Allen Hassan's action for injurious falsehood based on information Mercy provided Roseville Community Hospital (Roseville) regarding Dr. Hassan's qualifications, fitness and character for medical staff privileges.
Dr. Hassan had staff privileges at Mercy from 1970 to 1986. At Roseville's request, Mercy sent the hospital its file on Dr. Hassan, which included a memorandum of a telephone conversation between Mercy's Chief of Staff, Dr. Jensen, and the Associate Medical Director of Mendocino State Hospital, Dr. Cook, concerning Dr. Hassan's residency in psychiatry/neurology from 1969-1970. The telephone conversation followed upon a letter from Dr. Cook, which said Dr. Hassan had "a number of different personality problems .... that caused us to have to allow him to resign November 3, 1969, and his resignation was by mutual consent."
Dr. Hassan does not challenge the letter. Rather, he complains about the part of the memorandum in which Cook commented adversely on his residency and referred inter alia to Dr. Hassan's personality as "MILITANT vs. authority" and "[t]ends to identify with the underdog." The memorandum also stated that Dr. Hassan had a "satisfactory medical capability" and that he "might be desirable in general medicine but not with mentally disturbed." The adverse comments are the focus of Dr. Hassan's complaint, which he alleges are "false" and "libelous on its face."
The summary judgment is based on the view Civil Code section 43.8 grants an absolute privilege to any person who communicates information to a hospital regarding a medical practitioner.[1] On this point we disagree.
Section 43.8 is not absolute; it extends a privilege to the "communication of information *84 in the possession of such person to any hospital" only if the "communication is intended to aid in the evaluation of the qualifications, fitness [or] character" of a medical practitioner. (Italics added.) As we will show, the section rules out protection for intentional but not negligent misrepresentations.
We will conclude, on the basis of the papers tendered in the summary judgment proceeding, there is no disputed issue of fact that the information Mercy provided Roseville, at Roseville's request, was intended to aid in the evaluation of Dr. Hassan's qualifications, fitness and character. Accordingly, section 43.8 immunizes Mercy from Dr. Hassan's action for libel.
We will affirm the judgment.

Facts and Procedural History
Dr. Hassan was a member of Mercy's medical staff from 1970 to 1986. In September 1993, he applied for medical staff privileges at Roseville Community Hospital. In conformance with the application process, he signed a document entitled "Conditions of Application."[2]
As part of Roseville's investigation into Dr. Hassan's application, Donald M. Moran, M.D., chairman of Roseville's "Credentials Committee", wrote to Mercy asking for the dates of Dr. Hassan's affiliation with Mercy. Moran also asked Mercy to supply information about staff suspension or disciplinary actions, pending malpractice cases, and "past clinical performance noting anything that warrants exercising caution in granting clinical privileges." Moran's letter, dated October 8, 1993, set forth in bold type the following paragraph:
"Additionally, the facility at which Dr. Hassan received his residency is now defunct. If you have verification in your files of a residency in psychiatry/neurology at Mendocino State Hospital from 1967-1970, would you be so kind to forward a copy of such."
Lastly, Moran's letter offered to discuss confidential information with Mercy personally and asked for an early response to his request. With his letter Moran enclosed a copy of Dr. Hassan's signed "Conditions of Application" release form.
Dr. James Hansen, Mercy's Chief of Staff, responded to Moran's inquiry. He stated, in a cover letter dated December 14, 1993, "In response to your inquiry, we have searched our archive files on the subject physician." He provided a chronology of Dr. Hassan's 16 years on Mercy's medical staff,[3] and added: "I am also attaching copies of letters received concerning [Dr. Hassan's] residency in psychiatry/neurology as requested. Please accord these letters the confidentiality and *85 privilege that protects such letters of reference."
The attached letters included one written to Mercy by Dr. W.S. Cook, Associate Medical Director of the Mendocino State Hospital, dated December 30, 1969. Mercy received the Cook letter during the course of Mercy's own investigation into Dr. Hassan's 1969 request for medical staff privileges at Mercy. Cook's letter said:
"Dr. Hassan was at Mendocino State Hospital from June 26, 1967 to approximately July 1, 1969 as a psychiatric resident. He then went to Mt. Zion Hospital for his third year of training. While at Mendocino State Hospital a number of different personality problems arose in regard to Dr. Hassan but at no time did he demonstrate anything that could be considered unethical medical practice. He continued to have problems that caused us to have to allow him to resign November 3, 1969, and his resignation was by mutual consent. We would have terminated him if he hadn't resigned. Although we had a number of problems with Dr. Hassan, there was nothing that would preclude him from functioning ethically as a physician."[4]
Apparently Cook's letter caused Dr. Ralph S. Jensen, then Mercy's Medical Director, to call Cook two weeks later, in mid-January 1970 to discuss Dr. Hassan's tenure at Mendocino State Hospital in additional detail. Jensen prepared a memorandum of his telephone conversation with Cook (hereafter "the Jensen memorandum") and the memorandum resided in Dr. Hassan's files at Mercy during the time he was on Mercy's staff. The Jensen memorandum was among the materials Mercy sent to Roseville in response to Roseville's request and it is the wellspring of Dr. Hassan's complaints. It said:
"1-14-70 PHONE CONVERSATION WITH Dr. Cook (Mendocino State Hospital)
"RE: ALLAN [sic] C. HASSAN, M.D.
"Dr. Cook described him as having satisfactory medical capability. Would probably do all right in a private independent atmosphere.
"`MILITANT' vs. authority. Arrested for minor traffic offense; screamed `foul' and that he was beaten up by sheriff (not so). Sent letters to the newspaper re: police state tactics, etc.
"Tends to identify with the underdog. Became too personally involved with problems of the misfortunate or oppressed (Arabs esp.) might be desirable in general medicine but not with mentally disturbed. A `MANIPULATOR' of coworkers and supervisors, would advise against any contractual] arrangements. Predicts letters to Washington if any confrontation with Utilization Review, Etc."
In May 1994, after Roseville's investigation into Dr. Hassan's background, *86 Roseville's Medical Executive Committee recommended denying Dr. Hassan's application for staff privileges, noting four areas of concern: (1) negative recommendations from other hospitals, including limitations placed on Dr. Hassan's practice by Mercy and Dr. Hassan's resignation from his psychiatric residency program at Mendocino State Hospital; (2) prior disciplinary actions by Mercy and medical boards in California and Iowa; (3) omissions and misstatements on Dr. Hassan's application; and (4) Dr. Hassan's lack of any acute hospital experience in the previous 10 years. Dr. Hassan sought reconsideration of this decision.
In June 1995, Dr. Hassan filed a complaint against Mercy, asserting causes of action for defamation, intentional interference with prospective business advantage, and negligent interference with an economic relationship, all forms of injurious falsehood subject to the privileges in section 47 and following, including section 43.8. (Block v. Sacramento Clinical Labs, Inc. (1982) 131 Cal.App.3d 386, 182 Cal. Rptr. 438.)
Mercy's inclusion of the Jensen memorandum in the materials sent to Roseville is the source of Dr. Hassan's claims. He alleges the adverse comments in the memorandum are "false and detrimental" and "libelous on its face...." He asserts that Mercy "was aware that the said memorandum did not state the facts fully and fairly with regard to plaintiff," that Mercy "did not believe the contents of said memorandum to be true and had no reasonable ground for believing the contents of said memorandum to be true," and that Mercy acted with malice in including it in the materials sent to Roseville.
In August 1995, even though Dr. Hassan had not named Roseville as a defendant in his complaint, Dr. Hassan and Roseville entered into a "settlement agreement." Dr. Hassan agreed to withdraw his application for active staff membership and was admitted to the medical staff under the category of "Active Physicians with Limited Hospital Activity." He was granted limited clinical privileges.
In November 1996 Mercy moved for summary judgment or summary adjudication, claiming inter alia that its communications with Roseville were privileged under section 43.8 and section 47, subdivision (c), the "shared interest" privilege. Mercy asserted it had acted without malice, and had not interfered in any way with Dr. Hassan's relationship with Roseville. Mercy also argued that Dr. Hassan had consented to the release of the information and the privilege created thereby also precluded Dr. Hassan's lawsuit.
Dr. Hassan disputed each of these claims. He asserted in his declaration, filed in response to the motion for summary judgment, that he and Hansen had not gotten along and that Mercy transmitted the Jensen memorandum to Roseville out of malice. He contended the memorandum was "devoid of any significance `to aid the evaluation of the qualifications, fitness, character, or insurability.' The memorandum refers to personal observations some 26 years ago. It is remote as to time, is rife with speculation and smacks of racism and inherent bias and prejudice."
Mercy included in its papers interrogatories to Dr. Hassan and his answers thereto. No. 19 asked Dr. Hassan to "set forth each fact upon which you base your contention that: Defendant AMERICAN RIVER did not believe the contents of [the Jensen] memorandum ... to be true and had no reasonable ground for believing the contents of said memorandum to be true." In response, Dr. Hassan answered "Defendant AMERICAN RIVER at the time had no evidence to support any of the state-merits *87 made in the memorandum, and therefore no basis for believing any of it to be true."
Dr. Hassan submitted declarations from three doctors. Dr. Mark Winchester, a cardiologist, and Dr. Elmer Galioni, the former director of Mental Health Services for the State of California, opined, in identical language, that the Jensen memorandum "[did] not address Dr. Hassan's `qualifications' on a conventional basis or any other basis [and] is immaterial and irrelevant to such an evaluation." Dr. David Smith, a retired physician in the field of cardiovascular surgery, opined that "Dr. Hassan's medical practice was seriously prejudiced as a result of the Dr. Jensen memorandum being published by Dr. Hansen."
The trial court granted summary judgment, ruling: "Plaintiffs evidence in opposition to the motion fails to raise a triable issue of fact on the issue of absolute privilege pursuant to ... section 43.8. Because the communication was absolutely privileged, the entire complaint fails. Moreover, even if there was no absolute privilege, the Court finds no evidence of malice on the part of defendants and therefore this action is also barred by the qualified privilege in ... section 47[, subdivision] (c). (Plaintiff had no evidence of malice in deposition testimony and prior discovery responses, and contradictory statements in his declaration are properly disregarded.)"
The trial court entered judgment in favor of Mercy, and this appeal followed.

DISCUSSION

I
Preliminarily we resolve an issue tendered counsel by the court, whether the term "person," as used in section 43.8, includes a hospital.
Section 43.8 states, in pertinent part, that "no cause of action for damages shall arise against, any person" on account of the communication of certain information to a hospital, its medical staff and specified health care institutions and individuals.
Section 43.8 does not define "person," nor does section 43.91, which applies a similar immunity[5] to information communicated to professional society' committee members. Section 43.91 implies that "person" includes an entity since it exempts a professional society from its immunity provisions. Moreover, section 14, which applies to "[w]ords used in this code," provides "the word person includes a corporation as well as a natural person ...." By contrast, when a more restrictive application is intended by an immunity provision applicable to health care professionals and institutions, the code identifies the subject with particularity. (See e.g., § 43.7, which, in subd. (e), exempts a hospital from its coverage.) These provisions imply that, unless qualified expressly or embraced within a specific provision applicable to health care professionals and institutions, "person" is broadly inclusive of entities as well as natural persons.
Axline v. Saint John's Hospital and Health Center (1998) 63 Cal.App.4th 907, 913, 74 Cal.Rptr.2d 385, in dictum, suggests otherwise. The court said: "The Legislature did not specifically exclude hospitals from the scope of Civil Code section 43.8, as it did in section 43.7. Given the express language, the Hospital does not explain how it can fall within the definition *88 of `any person'. But even if somehow it could, the alleged misconduct does not relate to the communication of information to a hospital or a peer review committee. Thus, the immunity provided by section 43.8 for `the communication of information' is not triggered." We reject the court's dictum.
The dictum in an offhand speculation is not a ground upon which to rest a construction of "person" as used in section 43.8 and we do not.
For these reasons, we conclude that Mercy is a "person" as that term is used in section 43.8.

II

Civil Code Section 43.8 Does Not Establish an Absolute Privilege
The dispositive issue concerns the meaning of the privilege provided by section 43.8. It provides in pertinent part:
"In addition to the privilege afforded by Section 47 ... no cause of action for damages shall arise against, any person on account of the communication of information in the possession of such person to any hospital ... when such communication is intended to aid in the evaluation of the qualifications, fitness [or] character ... of a practitioner of the healing or veterinary arts. The immunities afforded by this section ... shall not affect the availability of any absolute privilege which may be afforded by Section 47." (Emphasis added.)[6]
The case arises on summary judgment. By his pleading and statements of undisputed facts, plaintiff put in issue whether Mercy knew the statements in the Jensen memorandum were false and irrelevant to Roseville's evaluation of his qualifications. (See FPI Development, Inc. v. Nakashima (1991) 231 Cal.App.3d 367, 282 Cal.Rptr. 508.) The trial court did not respond to these claims. Rather, following Johnson v. Superior Court (1994) 25 Cal.App.4th 1564, 31 Cal.Rptr.2d 199, it ruled that "[b]ecause the communication was absolutely privileged [under Civ.Code, § 43.8], the entire complaint fails." We disagree.
A privilege defeats a claim of injurious falsehood notwithstanding the elements of the tort are otherwise shown. (See Block v. Sacramento Clinical Labs, Inc., supra.) Since the issue was decided below on the ground of privilege we have no occasion to determine whether the Jensen memorandum was false or injured Dr. Hassan in his occupation.
Section 43.8 plainly conditions the application of the privilege on whether the communication was "intended to aid in the evaluation of the qualifications, fitness [or] *89 character" of a medical practitioner. "Well-established canons of statutory construction preclude a construction which renders a part of a statute meaningless or inoperative." (Manufacturers Life Ins. Co. v. Superior Court (1995) 10 Cal.4th 257, 274, 41 Cal.Rptr.2d 220, 895 P.2d 56.) Nonetheless, the Johnson court made no attempt at interpreting the phrase, wholly ignored the language, and relied on a policy which it discerned in the legislative history of a 1990 amendment to section 43.8, which deleted the following italicized language.
"[T]here shall be no monetary liability ... when [the] communication is intended to aid in the evaluation of the qualifications, fitness, character, or insurability of a practitioner of the healing or veterinary arts and does not represent as true any matter not reasonably believed to be true." (Stats.1984, ch. 515, § 4, p. 2058; see Stats.1990, ch. 1597, § 30, p. 7697.)
The court opined that "the objective of deleting the conditional language [italicized] above was to `[c]onvert a conditional immunity to absolute immunity.'" (25 Cal.App.4th at p. 1569, 31 Cal.Rptr.2d 199, orig. emphasis.) It based this conclusion on the view "[t]he legislative history of Senate Bill 2375 [the vehicle by which the condition was repealed] supports petitioners' claim that the Legislature intended to make the immunity conferred by section 43.8 absolute rather than conditional." (Ibid.)
"As with any statutory construction inquiry, we must look first to the language of the statute." (Diamond Multimedia Systems, Inc. v. Superior Court (1999) 19 Cal.4th 1036, 1047, 80 Cal. Rptr.2d 828, 968 P.2d 539.) Since the Johnson court did not examine the language of section 43.8, it did not explain how the deletion by repeal of one of two conditions effected a repeal of the retained condition nor in what manner the repeal affected the meaning of the retained condition. It would have been simple enough for the Legislature to have stated the privilege in absolute form, as the Johnson court would read it: "No cause of action for damages shall arise against any person on account of the communication of information to any hospital regarding the qualifications, fitness or character of a medical practitioner." [7] This phrasing, of course, deletes the very language which must be construed. Legislative intent does not provide a means by which to bootstrap a meaning which cannot be found in or implied from the statutory language.[8]
Moreover, the Johnson court's determination of legislative intent is inherently flawed. Section 43.8 does contain a lengthy statement of Legislative intent. However, it says no more of relevance than that the Legislature intended to provide "more information from a variety of enhanced reporting sources...." (Stats. 1990, ch. 1597, § 1, p. 7683.)[9] Notably *90 lacking is any statement that section 43.8 was intended to provide an absolute privilege.
In fact, section 43.8 is but one of several reporting provisions in Statutes of 1990, chapter 1597, by which the section was amended, two of which do provide for "absolute"[10] immunity in specified circumstances.[11] For example, chapter 1597 added section 2318 to the Business and Professions Code, to provide, in relevant part:
"In addition to any immunity afforded by Sections 43.8 and 47 of the Civil Code ... any person ... who provides information to the [medical] board, to the California Board of Podiatric Medicine, or to the Department of Justice indicating that a board licensee may be guilty of unprofessional conduct or may be impaired because of drug or alcohol abuse or mental illness, shall not be liable for any damages in any civil action on account of the communication of that information to the board." (Stats.1990, ch. 1597, § 22, pp. 7694-7695.)
Section 2318, unlike section 43.8, does provide an absolute privilege to a person who provides the specified information to the medical board.
This leaves open the question: what does "intended to aid" mean in light of the repeal of the condition that the author "does not represent as true any matter not reasonably believed to be true."

III

"Intended to Aid"
"[A l]ibel is a false and unprivileged publication by writing ... which [inter alia] has a tendency to injure [any person] in his [or her] occupation." (§ 45.) A privilege "operate[s] as [a] limitation[ ] upon liability [and provides] by negative implication, criteria for the tort." (Block v. Sacramento Clinical Labs, Inc., supra, 131 Cal.App.3d at pp. 389-390, 182 Cal. Rptr. 438.) This definition has been extended by case law to all forms of injurious falsehood. (Id. at pp. 390-391, 182 Cal. Rptr. 438.) Thus, a privilege defeats a claim of libel or any of the forms of injurious *91 falsehood notwithstanding proof of the other elements of the tort, i.e. that the communication was false and injurious.
Section 43.8 measures the privilege by whether the information conveyed was "intended to aid in the evaluation of the qualifications, fitness [or] character" of a medical practitioner. If that test is met the communication is protected notwithstanding that it is false or that it reflects badly on or injures the subject of the communication.
The question is how may this be shown? We advance two tests pertinent to this case. First, if the sender knows the information to be false it cannot have been intended to aid in an evaluation of the practitioner's qualifications. Such an intentional misrepresentation is manifested by "[t]he suggestion, as a fact, of that which is not true, by one who does not believe it to be true." (§ 1710, subd. 1.) "The requisite state of mind, or scienter, for ... intentional misrepresentation is disbelief in the truth of the statement, i.e., knowledge of falsity." (Anderson v. Deloitte & Touche (1997) 56 Cal.App.4th 1468, 1476, 66 Cal.Rptr.2d 512, orig. emphasis.) Second, if the information conveyed is patently irrelevant, i.e., would be known to the sender not to bear on an evaluation of the subject's qualifications, an inference arises the information was not intended to aid the evaluation.
The repealed condition bears on the circumstances in which the first test is applied. As noted, the repealed condition provided the privilege is defeated if the author "represent [s] as true any matter not reasonably believed to be true." This tracks the Civil Code definition of a negligent misrepresentation, "[t]he assertion, as a fact, of that which is not true, by one who has no reasonable ground for believing it to be true." (§ 1710, subd. 2; 5 Witkin, Summary of Cal. Law (9th ed. 1988) Torts, § 674, p. 775; Gagne v. Bertran (1954) 43 Cal.2d 481, 487-489, 275 P.2d 15; Anderson v. Deloitte & Touche, supra, 56 Cal.App.4th at pp. 1476-1479, 66 Cal.Rptr.2d 512.)
The deletion of the negligent misrepresentation provision removed whatever duty was imposed upon the sender of the communication to make a reasonable inquiry into the truth of the communication. "As is true of negligence, responsibility for negligent misrepresentation rests upon the existence of a legal duty, imposed by contract, statute or otherwise, owed by a defendant to the injured person." (Eddy v. Sharp (1988) 199 Cal.App.3d 858, 864, 245 Cal.Rptr. 211.) Thus, following the repeal of the negligent misrepresentation provision, section 43.8 no longer imposes a duty upon the sender to make reasonable efforts to assess the truth of the communication. An unreasonable belief in the truth of the information conveyed may not be used to show the intent of the conveyor. A negligent falsehood will not defeat the privilege; only an intentional misrepresentation will do.
Dr. Hassan seeks to place a burden on Mercy to investigate the truth of the information submitted. As noted, when asked to "set forth each fact upon which you base your contention that: Defendant AMERICAN RIVER did not believe the contents of [the Jensen] memorandum ... to be true," he answered: "Defendant AMERICAN RIVER at the time had no evidence to support any of the statements made in the memorandum, and therefore no basis for believing any of it to be true." But since Mercy is not responsible for a negligent misrepresentation it had no duty to investigate the truth of matter it submitted.
Thus, the privilege may be defeated only if the evidence affirmatively shows the *92 communication was not intended to aid in the evaluation of a health professional. Our concurring colleague suggests this should be measured by "the nature and subject matter of the proceedings in which the communication is made, and not the state of mind of the communicator." (Cone, opn., post, at p. 97.) "[I]t describes the environment in which the communication must be made in order for the statute to apply, thus protecting all communications made in the course of an evaluation of a health care practitioner." (Ibid., original emphasis.)
The language of the privilege belies this interpretation. It says the privilege attaches to "the communication of information in the possession of [any] person" only if the "communication is intended to aid in the evaluation of a medical practitioner's qualifications, fitness or character. What section 43.8 says, to supply the necessary implication, is: "if the communication is intended by the sender to aid in the evaluation of...." It cannot mean "by the recipient" because section 43.8 applies to unsolicited as well as solicited evaluations, i.e., to "the communication of information ... to any hospital [etc.]." (Emphasis added.) If the "protection] of all communications made in the course of an evaluation of a health care practitioner" was meant, the Legislature would have said: "No cause of action for damages shall arise against any person on account of the communication of information to any hospital regarding the qualifications, fitness or character of a medical practitioner." (See fn. 11, supra, and accompanying text.) It did not. Rather, the Legislature used the language of intention, which manifestly refers to the intention of the sender.
We examine the Jensen memorandum with these principles in mind. To isolate the application of the privilege to this case we start with the assumption, for purposes of argument, that the Jensen memorandum contained misrepresentations which had a tendency to injure Dr. Hassan in his occupation as a physician.

IV

The Jensen Memorandum
In a summary judgment proceeding the complaint and answer, together with the averments of undisputed facts, measure the materiality of the facts tendered in a defendant's challenge to the plaintiffs cause of action. (FPI Development, Inc. v. Nakashima, supra, 231 Cal. App.3d at pp. 381-382, 282 Cal.Rptr. 508.) "[T]he factual submissions of the parties must track these averments by providing evidence of the ultimate facts averred." (Id, at p. 382, 282 Cal.Rptr. 508.) A summary judgment is properly granted a defendant if, on all the papers submitted, there is no triable issue of fact concerning an element of the plaintiffs cause of action. (Code Civ. Proc., 437c, subds. (n),(o)(2).)
Dr. Hassan's complaint alleges the adverse statements in the Jensen memorandum are "false and detrimental" and "libelous on its face." These assertions are but the predicate for consideration of the privilege since a privilege defeats liability notwithstanding the false and injurious nature of the communication. Dr. Hassan also asserts that Mercy "was aware that the ... memorandum did not state the facts fully and fairly with regard to plaintiff. ..." This also is insufficient to tender an issue regarding the privilege since Mercy had no duty to expand on the information it had.
Dr. Hassan next asserts that Mercy "did not believe the contents of said memorandum to be true and had no reasonable ground for believing the contents of said memorandum to be true." Only the first of these assertions puts in issue a claim of *93 privilege since the reasonableness of Mercy's belief in the truth of the Jensen memorandum was ruled out when the negligent misrepresentation condition was deleted from section 43.8. Lastly, Dr. Hassan claims that Mercy acted with malice in including the Jensen memorandum in the materials sent to Roseville.[12] But malice as such will not defeat a claim of privilege under section 43.8.
The defendant tendered as an undisputed fact that "[t]he information provided to Roseville Hospital was provided to aid in the evaluation of Dr. Hassan's qualifications to practice medicine at Roseville Hospital." Dr. Hassan replied that this assertion was disputed for the reasons "[t]he material was 26 years old[,] was irrelevant to Plaintiffs qualifications[,] was forwarded to vex and harass Plaintiff[, and] was forwarded with ill will...." He contends the Jensen memorandum is "devoid of any significance `to aid the evaluation of the qualifications, fitness, character, or insurability.' [It] refers to personal observations some 26 years ago. It is remote as to time, is rife with speculation and smacks of racism and inherent bias and prejudice."
As support for these claims, Dr. Hassan submitted the declarations of two doctors, a cardiologist, Dr. Winchester, and a former mental health director, Dr. Galioni, who opined in identical language that the Jensen memorandum "[did] not address [plaintiffs] `qualifications' on a conventional basis or any other basis. [¶] The information is immaterial and irrelevant to such an evaluation." [13]
As noted, the Jensen memorandum relates the substance of a telephone conversation in mid-January 1970 between Dr. Ralph S. Jensen, then Mercy's Medical Director, and W.S. Cook, Associate Medical Director of the Mendocino State Hospital, which followed within two weeks the receipt of a letter by Mercy from Mendocino. The Jensen memorandum and letter resided in Dr. Hassan's files at Mercy along with the letter from Dr. Cook during the time he was on Mercy's staff.
Mercy sent the letter and memorandum in response to a specific request for the "verification in [Mercy's] files of a residency in psychiatry/neurology at Mendocino State Hospital from 1967-1970...." Although Dr. Hassan asserts the Jensen memorandum is not responsive to this request, there is nothing in the record which suggests that Mercy sent anything more or less than what was in its files relating to Dr. Hassan's residency at Mendocino State Hospital, nor is there evidence that Mercy singled out the Jensen memorandum for inclusion knowing it to be false.
Rather, the Jensen memorandum was sent along with a letter from Dr. W.S. Cook, Associate Medical Director of the Mendocino State Hospital, dated December 30, 1969, which opined that Dr. Hassan, had "a number of different personality problems ... that caused us to have to allow him to resign November 3, 1969, and his resignation was by mutual consent." [14] *94 The manifest purpose of the telephone conversation, which is summarized in the Jensen memorandum of a telephone call made two weeks after receipt of the Cook letter, was to determine the basis of Dr. Cook's judgment that Dr. Hassan had personality problems severe enough to warrant termination.
Without more, this evidence supports the sole inference that Mercy intended to comply with Roseville's request and the purpose of that request was to evaluate Dr. Hassan's fitness and qualifications for hospital privileges at Roseville.
The question is: what representation did Mercy make to Roseville regarding the Jensen memorandum? Did Mercy represent only that the memorandum was in its files, or did it vouchsafe the truth of its contents? It does not appear that Mercy was attesting to the truth of the statements made by the medical director of Mendocino State Hospital a quarter of a century ago. Mercy had no way of knowing whether the assertions made therein were true and no means to ascertain their truth. Rather, the telephone conversation, which was memorialized in the Jensen memorandum, amplified Dr. Cook's reasons for impugning Dr. Hassan's qualifications for psychiatric residency. These reasons are not attributable to Mercy. Rather, they reflect upon the quality of Dr. Cook's judgments. To the extent they reflect a bias it is Dr. Cook's bias and the more obvious the bias the more Dr. Cook's observations should have been discounted as based upon them.
Moreover, Dr. Hansen, who sent the Jensen memorandum to Roseville, was not the person who recorded the conversation with Dr. Cook and he had only Dr. Jensen's notes regarding his conversation with Dr. Cook. At best, Mercy had to rely on Dr. Cook's position as Associate Medical Director of Mendocino State Hospital, through Dr. Jensen, for the comments attributed to him. There is nothing in the record, other than their conceivable irrelevance, to suggest that Mercy knew the statements were false.
As noted, the (§ 43.8) privilege applies unless Mercy knew the assertions in the Jensen memorandum were false, not whether Mercy could not reasonably have believed in the truth of its assertions. Dr. Hassan and his declarants had no personal knowledge that Mercy knew the assertions were false and would have us infer its falsity solely from its relevance to the hospital privileges he sought at Roseville and from Dr. Hassan's assertions that Dr. Hansen bore him ill will or from Mercy's failure to investigate the truth.[15] However, Dr. Hansen's likes or dislikes of Dr. Hassan are not relevant to show that Dr. Hansen believed the Jensen memorandum assertions were false.
As to relevance, the record shows that Roseville sought the documents because of their bearing on Dr. Hassan's performance *95 as a psychiatric resident at Mendocino State Hospital.
"`Relevant evidence' means evidence ... having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid.Code, § 210.) "`Proffered evidence is relevant to prove or disprove a disputed fact if: ... [s]uch evidence in the light of logic, reason, experience, or common sense, has, by reasonable inference, a tendency to prove or disprove such disputed fact.' ..." (People v. Hill (1992) 3 Cal.4th 959, 987-988, 13 Cal. Rptr.2d 475, 839 P.2d 984, citations omitted.)
Relevance must be measured against the criteria established by section 43.8 for the privilege. We apply the measure in the light of the manifest policy of section 43.8 to provide a free flow of information in aid of safeguarding the public from incompetent or impaired health care professionals.
In this proceeding the disputed fact of consequence was Mercy's intent in responding to Roseville's request, and the question is whether the content of the Jensen memorandum was so patently irrelevant to an assessment of Dr. Hassan's "qualifications, fitness [or] character ... [as] a practitioner of the healing arts" as to give rise to an inference that Mercy did not intend to aid such an evaluation. The question is one for the court and is not dependent upon the testimony of medical professionals. Relevancy is not a subject for expert testimony and there is no foundational fact requiring such.
Applying this measure, the information provided in the Jensen memorandum was not patently irrelevant to an assessment of the basis of Dr. Cook's opinion concerning Dr. Hassan's performance as a psychiatric resident at Mendocino State Hospital. For all that the record shows, Mercy was simply responding to Roseville's request and was providing the full background of Dr. Cook's opinion concerning Dr. Hassan.
Nevertheless, the Jensen memorandum had relevance to Dr. Hassan's emotional fitness as a resident in psychiatry at Mendocino State Hospital and his performance in that capacity was the subject of Roseville's request to Mercy. Dr. Cook's telephone comment that Dr. Hassan was "MILITANT vs. authority" and tended to identify with the underdog was accompanied by the statement that Dr. Hassan "might be desirable in general medicine but not with the mentally disturbed."
Nor do we think the time frame of the events referred to in the memorandum establishes the memorandum is patently irrelevant. While remoteness may be considered a factor bearing on relevancy (Evid.Code, § 352; People v. Ochoa (1993) 6 Cal.4th 1199, 1206, 26 Cal.Rptr.2d 23, 864 P.2d 103), it is not dispositive on that issue where the behavior in question is ongoing (See People v. Mendoza (2000) 78 Cal.App.4th 918, 925, 93 Cal.Rptr.2d 216). Dr. Hassan adduced two professional declarants, Dr. Winchester and Dr. Galioni, who opined on the relevance of the Jensen memorandum's report of Dr. Cook's assessment of Dr. Hassan's performance as a psychiatric resident to his qualifications for hospital privileges at Roseville. However, Mercy's files included several disciplinary actions taken against plaintiff. Given Mercy's own experience with Dr. Hassan, it cannot be said that, from Mercy's point of view, the Jensen memorandum contained information that was patently irrelevant to Dr. Hassan's emotional fitness to practice medicine.
For these reasons we conclude, on the basis of the papers submitted in the summary judgment proceeding, there was no issue of disputed fact concerning Mercy's intent to aid Roseville in the evaluation of *96 Dr. Hassan's fitness and qualifications for hospital privileges.

Disposition
The judgment is affirmed. Respondent will recover its costs on appeal.[16]
I concur: MORRISON, J.
HULL, J., Concurring.
Although I respect their considerable experience when it comes to the task of statutory interpretation, I must, in part, disagree with my two colleagues in this matter, because they misinterpret the meaning of Civil Code section 43.8 (all further undesignated section references are to the Civil Code) after its amendment in 1990. I concur in the result.
Prior to 1990, section 43.8 provided, in pertinent part, as follows: "In addition to the privilege afforded by Section 47, there shall be no monetary liability on the part of, and no cause of action for damages shall arise against, any person on account of the communication of information in the possession of such person to any ... hospital [or] hospital medical staff ... when such communication is intended to aid in the evaluation of the qualifications, fitness, character, or insurability of a practitioner of the healing ... arts ... and does not represent as true any matter not reasonably believed to be true." (Stats. 1984, ch. 515, § 4, p.2058.)
Thus, until 1990, the immunity afforded by section 43.8 was conditioned on the communicator's reasonable belief in the truth of the information conveyed. In that year, the Legislature, having found California's system of physician discipline "inadequate to protect the health, safety, and welfare of the people of California" (Stats. 1990, ch. 1597, § 1, p. 7683), implemented comprehensive reform by enacting Senate Bill No. 2375, a portion of which amended section 43.8 by deleting from the statute the words "and does not represent as true any matter not reasonably believed to be true" (Stats.1990, ch. 1597, § 30 p. 7697).
When the Legislature struck the words "and does not represent as true any matter not reasonably believed to be true" from the statute, it intended to widen the population of those protected by the statute. The question is the reach of the amended statute.
Under the majority's view, the immunity the amended statute provides remains conditioned. They recognize that the statute no longer requires that a reporter's belief in the information he conveys be reasonable. But, under the majority's view, in order for the statute to apply, the information the reporter conveys cannot be a lie and it cannot be "patently irrelevant, i.e., ... known to the sender not to bear on an evaluation of the subject's qualifications. ..." (Maj. opn. ante, at p. 91.)
The majority comes to their conclusion by reading that portion of the statute that says its protections apply "when such communication is intended to aid in the evaluation of the qualifications, fitness, character, or insurability" (§ 43.8) of a practitioner to implicate the intentions and knowledge of the person making the communication. The majority interprets the statute as if it read: "when such communication is intended [by the person providing the information] to aid in the evaluation." So read, the majority reasons that a person who conveys a lie concerning a health care practitioner, or who conveys truthful information that he knows does not bear on the *97 evaluation of the subject's qualifications, cannot have "intended to aid" that evaluation. One must agree with the majority's conclusion, if one accepts the premise that it is the intent of the reporter that this language calls into issue. I do not accept the premise.
In my view, the protection of the amended statute is no longer conditioned on the belief of the reporter, whether reasonable or otherwise. When the Legislature struck the words that it did, it meant to extend the protection of the statute to any person who provides information during the course of an evaluation of a health care practitioner by a hospital, or other entity specified in the statute, even in the circumstance where that person lied, or knew the information he conveyed did not bear on that evaluation. In order to encourage the communication of information necessary to a meaningful evaluation of health care practitioners, the Legislature, by striking the entire phrase from the end of the statute, intended to take the mental state of the reporter out of the equation. This is so for a number of reasons.
First, if the Legislature wanted to preserve a requirement that the reporter at least subjectively believed his information was true, it could have done so by deleting only the word "reasonably" from that portion of the statute that it deleted entirely.
More importantly, the majority misperceives the focus of the words "when such communication is intended to aid in the evaluation." The majority says the words call into question the intent and knowledge of the reporter. But, instead, the words refer to and describe the nature and subject matter of the proceedings in which the communication is made, not the state of mind of the communicator. The phrase does not refer to the reporter's mental state; it describes the environment in which the communication must be made in order for the statute to apply, thus protecting all communications made in the course of an evaluation of a health care practitioner.
When uncertainty arises as to the meaning of a statute, consideration should be given to the consequences that could flow from a given interpretation. (Dyna-Med, Inc. v. Fair Employment & Housing Com. (1987) 43 Cal.3d 1379, 1387, 241 Cal.Rptr. 67, 743 P.2d 1323.) Statutes should be construed to produce results that are reasonable and consistent with the legislative purpose. (People v. Jeffers (1987) 43 Cal.3d 984, 997, 239 Cal.Rptr. 886, 741 P.2d 1127.) "[W]here the language of a statutory provision is susceptible of two constructions, one of which, in application, will render it reasonable, fair and harmonious with its manifest purpose, and another which would be productive of absurd consequences, the former construction will be adopted." (Clements v. T.R. Bechtel Co. (1954) 43 Cal.2d 227, 233, 273 P.2d 5.)
In effect, the majority has decided that the Legislature intended to remove the requirement that the person conveying the information have a reasonable belief in its truth, but intended to leave in place a requirement that the person have some belief in its truth. The majority concludes also that the Legislature intended to deny the statute's protection to anyone whose information was "known to the sender not to bear on an evaluation of the subject's qualifications" (maj. opn. ante, at p. 91), thus implicating, I suppose, two issues: Did the information, in fact, bear on a health care practitioner's qualifications and, if not, did the reporter know it did not? Thus, the majority's reading of the statute has the Legislature affording to one who conveys information concerning the abilities of a health care practitioner the cold comfort of being assured that a lawsuit brought by an angry and disgruntled *98 doctor will not question whether the reporter reasonably believed in the fact reported but only (1) whether he believed in the fact reported at all, (2) whether the fact reported had a bearing on the evaluation and, (3) if it did not, whether the reporter knew it did not. I note in passing that this is not often the stuff of summary judgment.
The intent of the legislation here at issue was to increase the protections afforded the People of California against impaired or incompetent health care practitioners. The majority's interpretation of the statute is inconsistent with that intent. Common sense suggests the Legislature's goal of safeguarding the public from impaired, or incompetent physicians depends, in the main, on the availability of information concerning a physician's professional history, information that the physician is free to explain, and that the evaluator is free to accept, or reject, as bearing on the physician's professional abilities.
A health care practitioner, like most anyone else, will often attribute base motives to those who give information unfavorable to an evaluation of his abilities and fitness. He can easily allege the information was either a lie, or "patently irrelevant," and, as a result, the persons most knowledgeable about his abilities, threatened with the burden and expense of litigation, may be reluctant to convey it, opting instead to withhold it, or equivocate.
To condition the protection of the statute on subtle determinations of that which does or does not bear on qualifications, fitness, character, or insurability, is to add a condition that defeats the statute's purpose. A person with information that he believes to be true may still choose to err on the side of silence for fear that a jury may later decide the information, though true, did not in the jury's view bear on the physician's qualifications, fitness, character, or insurability, or for fear that it might require a jury finally to decide that it did. Such understandable caution compromises public safety and raises the specter of exactly that which the Legislature intended to avoid: the suppression of information due to fear of litigation. With respect, I cannot subscribe to the majority's reading of the law or to its view of the intent of the Legislature.
Mercy American River Hospital's (Mercy) motion for summary judgment contends that "[t]he information provided to Roseville Hospital was provided to aid in the evaluation of Dr. Hassan's qualifications to practice medicine ..." and that, on that basis, its communication was protected by section 43.8.
In support of that contention, Mercy relies on Dr. Donald M. Moran's letter, dated October 8, 1993, to Mercy, which advised Mercy of Hassan's application and asked for information intended "for [Roseville's] review of his application" and Hansen's responsive letter, dated December 14, 1993, which, in part, forwarded information gathered relative to Hassan's request for medical staff privileges at Mercy in 1969. This information had been maintained in Mercy's files. Hassan does not challenge the fact, or content, of either Moran's letter, or Dr. James Hansen's response.
These letters demonstrate that, in order to make an informed decision on Hassan's request for medical staff privileges, Roseville Community Hospital wrote to Mercy specifically seeking information about Hassan's tenure on Mercy's staff and his earlier residency at Mendocino State Hospital. Mercy complied with this request by sending a chronology of Hassan's service at Mercy and materials residing in Mercy's files, some of which was gathered by Mercy *99 during its own evaluation of Hassan in 1970.
On these undisputed facts it is apparent that this communication between Mercy and Roseville was made during the course of Roseville Community Hospital's evaluation of Hassan's qualifications, fitness, character, and insurability. On those facts alone, Mercy's response was protected by the provisions of section 43.8 regardless of Mercy's belief in the truth of the information, or its relevance. For that reason, the trial court properly granted summary judgment and the judgment must be affirmed.
NOTES
[1] A reference to a section is to the Civil Code.
[2] "BY APPLYING FOR ALLIED HEALTH PRACTITIONER PRIVILEGES AT ROSEVILLE HOSPITAL, I HEREBY:

"........................
"authorize the hospital, its medical staff and their representatives to consult with my prior and current associates and others who may have information bearing on my professional competence, character, health status, ethical qualifications, ability to work cooperatively with others; and other qualifications for the services I request;
"consent to the inspection by the hospital, its medical staff and their representatives of all documents that may be material to an evaluation of my qualifications and competence;
".............................
"release from liability any and all individuals and organizations who provide information to the hospital or the medical staff, in good faith and without malice concerning my professional competence, ethics, character, and other qualifications to provide professional services[;]
"................................."
[3] The chronology included descriptions of several disciplinary actions taken against plaintiff.
[4] The materials also included a letter from Mercy's files, dated January 2, 1970, from the Director of Medical Education at Mt. Zion Hospital to The Sacramento County Medical Society, which commented adversely on Dr. Hassan's suitability as a resident in Psychiatry at Mt. Zion, but which did recommend his acceptance as a member of the Medical Society.

The letter states that plaintiff served as an intern in 1967-1968 "and performed overall in an average manner. Basically, he is a very nice young man and during his internship period we had no reason to criticize his professional] moral[,] and ethical standards. [¶] I think it is only fair to add that he did enter our residency program in Psychiatry here and proved to be unsuitable in that capacity and he did leave rather abruptly during his residency training. [¶] I, personally, am very fond of Dr. Hassan and feel that he is a very likeable and pleasant physician who probably would have benefited from further training in some field other than Psychiatry."
[5] Section 43.91 retains the language deleted from section 43.8, which we discuss in the next section.
[6] Section 43.8 provides in full:

"In addition to the privilege afforded by Section 47, there shall be no monetary liability on the part of, and no cause of action for damages shall arise against, any person on account of the communication of information in the possession of such person to any hospital, hospital medical staff, veterinary hospital staff, professional society, medical, dental, pediatric school, or veterinary school, professional licensing board or division, committee or panel of such licensing board, the Senior Assistant Attorney General of the Health Quality Enforcement Section appointed under Section 12529 of the Government Code, peer review committee, quality assurance committees established in compliance with Sections 4070 and 5624 of the Welfare and Institutions Code, or underwriting committee described in Section 43.7 when such communication is intended to aid in the evaluation of the qualifications, fitness, character, or insurability of a practitioner of the healing or veterinary arts. The immunities afforded by this section and by Section 43.7 shall not affect the availability of any absolute privilege which may be afforded by Section 47."
[7] A potent test of meaning is to produce a hypothetical draft of the statute which expresses the claimed meaning in the clearest language possible and then to compare this draft with the actual language of the statute. The resulting comparison will reveal any semantic deficiencies in the claimed meaning.
[8] Johnson cites to a letter from the California Medical Association regarding a companion bill, Assembly Bill No. 3563, and to the opposition of the Union of American Physicians and Dentists. (25 Cal.App.4th at p. 1569, 31 Cal.Rptr.2d 199.) Their views of the meaning of section 43.8 are just that, their views, not the Legislature's views, which are to be found in the language of its creation.
[9] The only reference to reporting is found in Section 1 of Statutes of 1990, chapter 1597, page 7683, which states: "It is ... the intent of the Legislature to restructure the physician discipline system of the Medical Board of California in order to give it authority to act quickly in extreme cases to impose interim protective measures or final sanctions short of license revocation or suspension; more information from a variety of enhanced reporting sources and increased public outreach (Emphasis added.)

Johnson does not cite to this statement of intent. Rather, it implies a broad policy to provide immunity from a generalized Legislative purpose to restructure and improve the discipline system of physicians and health professionals. (25 Cal.App.4th at p. 1569, 31 Cal.Rptr.2d 199.)
[10] The term "absolute" is a semantic distraction. A privilege is "absolute" only in the sense that it provides immunity in the circumstances specified. For example, section 2318, discussed above, "absolutely" protects a communication only if the information conveyed "indicates" unprofessional conduct or the impairment of a practitioner due to drug or alcohol abuse or mental illness.
[11] In addition to Business and Professions Code section 2318, discussed above, section 2 of chapter 1597 of Statutes of 1990, added section 802.5 to the Business and Professions Code, relating inter alia to a report by a coroner to the Medical Board concerning a physician's gross negligence or incompetence, to provide that: "No board-certified or board-eligible pathologist, ... shall be liable for damages in any civil action as a result of his or providing [such] information...."

We note also that section 805 of the Business and Professions Code, relating inter alia to the filing of written reports concerning an application for staff privilege, was also amended by section 5 of chapter 1587. It contained a provision, previously enacted, that: "(d) No person shall incur any civil or criminal liability as the result of making any report required by this section." (Stats.1990, ch. 1597, §§ 2, 5, pp. 7683-7686.)
[12] In support of the claim of malice, Hassan asserted in a declaration that he and Hansen, who acted to provide the information to Roseville, had not gotten along.
[13] A second doctor, Dr. David Smith, attested only to the injurious effect of the Jensen memorandum. That issue is assumed for purposes of this analysis.
[14] It should be noted that in between the Cook letter and the telephone conversation Mercy was in receipt of a letter, dated January 2, 1970, from the Director of Medical Education at Mt. Zion Hospital to The Sacramento County Medical Society, which commented adversely on Dr. Hassan's suitability as a resident in Psychiatry at Mt. Zion and which said that Dr. Hassan "did enter our residency program in Psychiatry here and proved to be unsuitable in that capacity. (See In. 4, infra.) Dr. Hassan does not challenge this letter.
[15] As noted, Mercy included in its papers interrogatories to Dr. Hassan and his answers thereto. No. 19 asked Dr. Hassan to "set forth each fact upon which you base your contention that: Defendant AMERICAN RIVER did not believe the contents of [the Jensen] memorandum ... to be true and had no reasonable ground for believing the contents of said memorandum to be true." In response, Dr. Hassan answered: "Defendant AMERICAN RIVER at the time had no evidence to support any of the statements made in the memorandum, and therefore no basis for believing any of it to be true." This shows Dr. Hassan had no evidence of Mercy's knowledge of the falsity, if any, of the assertions in the Jensen memorandum.
[16] This disposition makes it unnecessary to review defendant's remaining claims in support of the judgment.