Filed 9/20/24  P. v. Jacobson CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>v.<br><br>NICHOLAS WADE JACOBSON,<br><br>    Defendant and Appellant. | A164149<br><br><br>(Contra Costa County<br>Super. Ct. No. 05-1801215-7) |

On a night in June 2017, Nicholas Wade Jacobson fatally shot Robert Frazier, for which a jury convicted him of first degree murder and possessing a firearm as a felon, while finding true an allegation that he personally discharged a firearm causing death.  (Pen. Code, §§ 187, subd. (a), 29800, subd. (a)(1), 12022.53, subd. (d).)[1]  After the verdict—and represented by new counsel—Jacobson moved for a new trial.  He argued that the prosecutor committed prosecutorial error by eliciting false evidence in violation of *Napue v. Illinois* (1959) 360 U.S. 264 (*Napue*), and that his trial attorney provided ineffective assistance of counsel by not using available video evidence to disprove the allegedly false evidence.  The trial court denied the motion and sentenced Jacobson to 50 years to life, which included 25 years to life for the firearm enhancement (hereafter section 12022.53(d) enhancement).

---

[1] All undesignated statutory citations are to the Penal Code.

On appeal, Jacobson contends the false evidence requires reversal of the judgment of conviction, or that it and the ineffective assistance of counsel each require reversal with directions to order a new trial. We disagree that the alleged false evidence requires reversal, decline to reach the ineffective assistance claims on this direct appeal, and thus affirm his convictions.[2] He also claims we must remand for resentencing because the trial court was unaware of its discretion to strike the firearm enhancement and impose a lesser enhancement, rather than impose none at all. We agree. We will remand for resentencing so the trial court may determine whether to strike the section 12022.53(d) enhancement and, if so, whether to impose an appropriate lesser uncharged statutory enhancement. (See *People v. Tirado* (2022) 12 Cal.5th 688, 692 (*Tirado*).)

## BACKGROUND[3]

For a period of time not specified in the record, but ending at least a year before the June 2017 shooting, Jacobson dated Maria B. (Mimi). Their

---

[2] In a related petition for habeas corpus (case No. A169767), Jacobson raises multiple grounds for relief. They include claims of prosecutorial error involving assertedly false evidence and claims of ineffective assistance of counsel encompassing the substance of the ineffective assistance claim raised on this appeal. By separate order issued today, we grant the petition in part, requiring the Department of Corrections and Rehabilitation to show cause why relief should not be granted on one claim of ineffective assistance that is factually distinct from Jacobson's claims on appeal, and otherwise deny the petition.

[3] In this section, we recite facts that the prosecution offered in evidence at trial to support their theory of the case. Jacobson has not made a substantial evidence challenge to the jury's verdict. As noted (see fn. 2, *ante*) he has filed a petition for writ of habeas corpus, in which he contends the prosecutor used false evidence to induce the jury to find certain facts, and that his counsel provided ineffective assistance by failing to use video evidence to show what Jacobson contends are the true facts. On appeal, he has raised some of the same claims. Our recitation of facts based on evidence

2

romantic relationship ended in 2016 or earlier, but he called Mimi repeatedly during the first half of 2017. In May 2017, Mimi began dating Frazier, a large, muscular man who worked security at a nightclub in Concord (the club). Frazier knew of Mimi's past relationship with Jacobson.

A week or two before the shooting, Jacobson was asked to leave the club. On the night of the shooting, he had reserved a table at the club. Although Frazier was not working that night, he knew of Jacobson's reservation, and he and Mimi planned to meet at the club.

The club's entrance door did not open onto the sidewalk; instead, a walkway led from the sidewalk to the door. A rope line on the sidewalk funneled people approaching the club to the walkway. Security cameras recorded the walkway, the rope-lined stretch of sidewalk, and the club's interior.

Mimi arrived at the club shortly after 11:45 p.m. A minute later, Jacobson arrived at the club with a friend. Security camera video showed they entered without being searched. Jacobson was wearing a collared shirt. Once inside the club, however, he removed it and spent the rest of the night in a T-shirt. At 1:00 a.m., Frazier arrived with a friend. Security camera video showed they too were not searched.

Evidence at trial indicated that, during the nearly two hours he was at the club, Jacobson got drunk, groped Mimi and two female servers, including A.A., and danced in a sexually aggressive way with Mimi. A.A. testified that, after Frazier entered the club, Mimi moved between the two men's tables, which upset Jacobson. Just after 1:35 a.m., Mimi led Jacobson off the floor to talk to security. Frazier followed but did not become involved in the

offered at trial is not meant to establish the veracity of any such facts but only to provide context for analyzing, based on the record at trial, the issues raised on appeal.

3

conversation.  A security guard, M.M., asked Jacobson to leave, and he agreed.

At 1:44 a.m., Jacobson walked out of the club and down the entranceway to the sidewalk.  About 15 seconds later, he briefly returned to the entrance to insist on shaking hands with a security guard in the club named Alfonso who had, earlier in the night, accused Jacobson of "grabbing on" his girlfriend.  Jacobson then walked back to the sidewalk and proceeded to a Chevy Suburban parked about 40 yards away.

While Jacobson was at his vehicle, Frazier walked out of the club to the sidewalk, leaving the club about 35 seconds after Jacobson's handshake with Alfonso.  Jacobson then walked back from his vehicle toward the club.  According to M.M., Jacobson and Frazier had a brief verbal confrontation on the sidewalk between the club entrance and the location of Jacobson's vehicle, outside the cameras' view, and then separated.  Jacobson walked a second time to his Suburban.

About 10 seconds later, Jacobson walked quickly back toward the club.  Frazier stepped in his path, saying, "Fuck this shit."  Jacobson said, "What's up?  Do you want to do this?" or "Let's do this."  He drew a handgun from his waistband.  With one hand, Frazier reached for the gun; with the other he threw a punch.  The men struggled briefly over the gun until Jacobson pulled the trigger once.  The bullet pierced Frazier's heart; he collapsed and soon died.  Jacobson fled in the Suburban but was later apprehended after crashing a different vehicle.

The district attorney charged Jacobson with murder (§ 187, subd. (a)), with an enhancement for personally and intentionally firing a gun causing great bodily injury and death (§ 12022.53, subd. (d)), and with possessing a

4

firearm as a felon (§ 29800, subd. (a)(1)). The case proceeded to trial in March 2021.

In his opening statement, the prosecutor identified jealousy as a central motive for the shooting. He noted that M.M., the security guard, would testify that security at the club "will pat search people before they enter the [club] to make sure that weapons aren't brought into the club." The prosecutor also stated that, after being asked to leave the club, Jacobson went to his vehicle and "instead of driving home . . . grabbed a handgun," returned, and shot Frazier.

When M.M. took the stand, the prosecutor asked him about the club's search procedure, and he testified: "We do a full search. No in-and-outs. Once you go in, you are searched." M.M. testified that everyone was supposed to be searched, but that he did not recall if he searched Jacobson that night. Neither party offered other evidence about searches or played the video that showed Jacobson and Frazier, and their respective friends, each enter the club without being searched.

In his initial closing statement, the prosecutor argued that, after the first confrontation with Frazier on the sidewalk outside the club, Jacobson went to his vehicle to get a gun. The prosecutor described Jacobson's choice "to return with the gun" as evidence of the premeditation required for first degree murder. (§ 189, subd. (a).) The prosecutor also identified as evidence of premeditation that Jacobson brought a gun that night to the area of the club and, before confronting Frazier, hid the gun in his waistband.

In his closing argument, Jacobson's attorney, Erik Babcock, contended it had been Frazier who was jealously focused on Jacobson, while no evidence showed Jacobson knew of Frazier's relationship with Mimi. Babcock argued there was no evidence that Jacobson's purpose in walking back toward the

5

club was to confront Frazier, and there was another explanation: Jacobson came back to get the collared shirt he had left behind. When the physically imposing Frazier stepped angrily in his path and threw a punch, Jacobson acted in self-defense.

In his closing rebuttal argument, the prosecutor noted A.A.'s testimony that Mimi's attention to Frazier in the club had upset Jacobson. The prosecutor stated several times that Jacobson went to his vehicle to "get" or "grab" a gun. He also argued that Jacobson's past experience with the search policy had led him to leave the gun in his vehicle when he arrived that night: "He had been kicked out of the [club] beforehand. He had also been pat searched beforehand because it had been stated by [M.M.] that everybody gets pat searched. He knew what he was doing when he brought the gun with him and left it in the car. He knew exactly what he was doing when he went and got that gun." After asking rhetorically, "What's the evidence of premeditation and deliberation?" the prosecutor stated, "Over 40 yards to and from that Suburban all the time to weigh and reflect. Nobody is following me. I can just go home." But Jacobson "decided that he wanted to grab a gun," confront Frazier, and make him back down or else shoot him.

The jury convicted Jacobson on both charges and found the allegations supporting the firearm enhancement true.

Before sentencing, Jacobson moved for a new trial. His new attorneys submitted video clips—excerpted from the full video files submitted at trial— that showed him and Frazier each enter the club without being searched. As relevant here, Jacobson claimed the prosecutor violated *Napue*, *supra*, 360 U.S. 264 by offering false evidence that everyone entering the club was searched and by assertedly arguing that, because Jacobson had been searched, he could not have had a gun, so he must have gone to his vehicle to

6

get one. Jacobson claimed this argument was "crucial to proving the element of premeditation and deliberation." He also argued that Babcock provided ineffective assistance of counsel by not using the video to rebut the prosecutor's argument by noting that Jacobson could have had the gun all night, rather than having gone to his car to retrieve the gun after an initial confrontation with Frazier.

The prosecutor opposed the new trial motion. After a hearing in October 2021, the trial court denied it. For several reasons, the court found no prejudicial violation of *Napue*. It also found no ineffective assistance of counsel.

At sentencing, the trial court denied Jacobson's request to strike the firearm enhancement (§ 12022.53, subd. (d)). It sentenced him to 50 years to life, which included 25 years to life on the enhancement.

## DISCUSSION

### I.

### *Jacobson Has Not Shown Prosecutorial Error.*

Jacobson claims the prosecutor denied him due process by eliciting false evidence, in violation of *Napue*, *supra*, 360 U.S. 264, to prove the premeditation element of first degree murder. (§ 189, subd. (a).) Jacobson describes the alleged violation as follows. Despite knowing from the video that Jacobson had entered the club without being searched, the prosecutor elicited false testimony that security searched all guests and then relied on it to argue Jacobson was searched that night. The prosecutor based his theory of premeditation on that false premise by arguing that, because Jacobson had been searched, he could not have had a gun in the club, so his purpose in going to his vehicle before the shooting must have been to get one, which showed premeditation.

7

Claims that a prosecutor elicited false evidence or made a deceptive argument are claims of prosecutorial error. (*People v. Avila* (2009) 46 Cal.4th 680, 711; *People v. Daveggio and Michaud* (2018) 4 Cal.5th 790, 853–854 (*Daveggio*) [preferring "prosecutorial error" over "prosecutorial misconduct"].) The standards governing such claims are well settled: Prosecutorial error "occurs, as a matter of state law, when a prosecutor 'engage[s] in deceptive or reprehensible tactics in order to persuade the trier of fact to convict.' " (*Id.* at p. 854.) Federal constitutional error occurs only if a prosecutor's conduct made a trial " 'so unfair that the resulting conviction violates the defendant's right to due process of law.' " (*Ibid.*) The use of false evidence qualifies as federal constitutional error. (*Napue*, *supra*, 360 U.S. at pp. 265, 269 [due process bars conviction secured by eliciting or failing to correct false evidence].)

Jacobson's claim fails for three reasons: He has identified no *false* evidence, the prosecutor never argued Jacobson was searched *that night*, and the prosecutor's actual argument was not improper. First, Jacobson identifies no false evidence. Here, the only evidence about searches was M.M.'s testimony, and Jacobson has not shown it to be false. The prosecutor asked M.M. if the club had a "procedure in place . . . for searching people" to keep out things "you don't want in the club." He answered, "We do a full search. No in-and-outs. Once you go in, you are searched." On cross-examination, he affirmed "everyone is supposed to be pat-searched before they come in." On the night of the shooting, he oversaw searches when he was at the entrance, but he was not at the entrance all night. He recalled searching unspecified "people" that night but did not recall if he searched Jacobson.

The video does not show any of that testimony to be false. It shows only that one or two guards that night allowed some guests—including Jacobson and Frazier—to enter without being searched. Jacobson does not claim M.M. himself let guests enter without being searched or was aware of other guards doing so. Jacobson thus has not shown M.M.'s testimony was untruthful, or that the policy did not exist. To the contrary, the video on which he relies shows guards searching many guests. His own motion for a new trial acknowledged that M.M. "appeared to have been correct about the club's general policy of searching male patrons."

Because Jacobson has identified no false evidence, we next assess his claim under state law barring the use of deceptive means to persuade a jury. (*Daveggio*, *supra*, 4 Cal.5th at p. 854.)[4] As such, the claim fails for the second reason noted above: The prosecutor never stated Jacobson was searched *that night*. Instead, the prosecutor stated he "brought a gun with him in that Suburban" and later decided to "go to his car, get the gun," and "return with [the] gun." Contrary to Jacobson's assertions, the prosecutor never argued he could not have had a gun in the club, or had to get one from his car, because he was searched that night.

---

[4] Jacobson briefly asserts federal due process bars the use of "false or misleading argument," but neither decision he cites holds that "false argument" alone, without false evidence, can violate due process. (See *Miller v. Pate* (1967) 386 U.S. 1, 7 [conviction obtained by "use of false evidence"]; *People v. Sakarias* (2000) 22 Cal.4th 596, 633 [referring to "use of false evidence or argument" but not applying "false argument" concept].) In any event, it does not matter if "false or misleading argument" alone can violate due process, for Jacobson cites no federal due process standard defining "false or misleading argument," let alone one differing from the state law standard barring use of " 'deceptive . . . tactics.' " (*Daveggio*, *supra*, 4 Cal.5th at p. 854.)

The third reason Jacobson's claim fails is that the prosecutor's actual argument was not deceptive. He referred only once to Jacobson having been "searched," and his words referred to a *previous night*. He stated Jacobson "had been kicked out of the [club] beforehand. *He had also been pat searched beforehand because it had been stated by* [*M.M.*] *that everybody gets pat searched*. He knew what he was doing when he brought the gun with him and left it in the car." (Italics added.) In context, "beforehand" meant *before that night*: Because Jacobson had been searched before the night of the shooting, he chose when he arrived at the club that night to leave his gun in his car.

Such an argument is well within a prosecutor's " ' "wide latitude to vigorously argue" ' " a case and fairly comment on the evidence, which includes urging reasonable inferences. (*People v. Peoples* (2016) 62 Cal.4th 718, 796.) While it is true that the club's security guards did not follow the search policy strictly on the night of the murder, the same video evidence on which Jacobson relies shows that many patrons were searched on that night—which, as we have noted, led Jacobson to acknowledge below "the club's general policy of searching male patrons." At oral argument in this appeal, Jacobson's counsel emphasized the lack of evidence that Jacobson had been searched on prior visits to the club, but nor was there evidence that he had *not* been searched each time he frequented the club in the past. Thus, contrary to appellate counsel's assertions, it was not improper to urge the jury to infer from M.M.'s testimony about the search policy, coupled with evidence that Jacobson had visited the club previously, that Jacobson had been searched on one or more prior visits, and the experience led him to leave his gun in his vehicle when he arrived and parked that night. Whether the inference was sound was for the jury to decide. (*People v. Warren* (1988) 45 Cal.3d 471, 485, fn. 1.)

10

At oral argument, appellant relied on a decision recently issued by our colleagues in Division Two, *In re Hill* (Aug. 2, 2024, No. A166191) __ Cal.App.5th __ [2024 Cal.App.Lexis 541], for the proposition that a defendant can base a *Napue* claim on a showing that the prosecutor exploited a misleading impression created by testimony that may have been true " 'in a narrow, literal sense' " but was highly misleading in effect. (*Id.* at p. __ [2024 Cal.App.Lexis 541 at p. *39].) *Hill* is distinguishable from our case, for it involved an unusual "multilayered" *Napue* claim based on misleading testimony that the jury never heard, which concerned facts unrelated to the crime, but which the prosecutor used to persuade the court to admit incriminating evidence that the jury did hear. (*Id.* at p. __ [2024 Cal.App.Lexis 541 at p. *30].) A witness named McCray made a statement to police implicating Hill as the killer, and himself as an accomplice. (*Id.* at p. __ [2024 Cal.App.Lexis 541 at p. *4].) At Hill's preliminary hearing, McCray testified that he had not been "promised any kind of leniency . . . if [he] would have testified" in the case. (*Id.* at p. __ [2024 Cal.App.Lexis 541 at p. *18].) At trial, the prosecutor called McCray, who invoked the Fifth Amendment. (*Ibid.*) After the prosecutor declined to provide McCray immunity, the court accepted his Fifth Amendment claim and found him "unavailable" to testify. (*Id.* at p. __ [2024 Cal.App.Lexis 541 at p. *21].) On that basis, the court allowed the prosecutor to offer McCray's statements to police into evidence under a hearsay exception dependent on the declarant being unavailable to testify. (*Ibid.*)

Hill based his habeas petition on his discovery, 20 years later, of a letter the district attorney had sent to McCray's counsel—before the preliminary hearing—promising not to prosecute McCray. (*In re Hill, supra,* __ Cal.App.5th at p. __ [2024 Cal.App.Lexis 541 at pp. *31–32].) The People

11

argued McCray's preliminary-hearing testimony was not false because the letter had not expressly tied its promise to future testimony. (*Id.* at p. __ [2024 Cal.App.Lexis 541 at p. *33].) Disagreeing, Division Two found it "difficult . . . to view the prosecutor's refusal to grant immunity to a witness it has secretly promised not to prosecute as anything other than gaming the system." (*Id.* at p. __ [2024 Cal.App.Lexis 541 at p. *44].) The prosecutor thus allegedly leveraged misleading preliminary hearing testimony to deceive the judge about the validity of a witness's invocation of the Fifth Amendment, in order to secure the admission of hearsay statements incriminating the defendant in a way preventing the defendant from cross-examining the witness. (*Id.* at p. __ [2024 Cal.App.Lexis 541 at pp. *31–32].)

Our case is nothing like that.[5] Unlike the prosecutor in *Hill*, the prosecutor here did not conceal anything from the defense or impair its ability to cross-examine witnesses. (See *In re Hill*, *supra*, __ Cal.App.5th at pp. __, __[2024 Cal.App.Lexis 541 at pp. *70–71, *31–32] [holding that concealment of promise not to prosecute violated *Brady v. Maryland* (1963) 373 U.S. 83, and noting large "overlap" between *Napue* and *Brady* claims].) Instead, the prosecutor relied on truthful testimony about the Club's search

---

[5] While Jacobson has pointed out in this appeal certain inaccurate testimony about searches given by M.M. at the preliminary hearing as background for his claims of ineffective assistance of counsel, he has never contended that the prosecutor used the false preliminary hearing testimony in a way supporting relief under *Napue*. Nor did he request at oral argument that he be permitted to newly assert a *Napue* claim based on the preliminary hearing testimony. In any event, *Hill* is distinguishable, for the prosecutor there relied on the false preliminary hearing testimony to persuade the judge, at trial, to admit certain otherwise-inadmissible evidence, which the jury heard. (*In re Hill*, *supra*, __ Cal.App.5th at p. __ [2024 Cal.App.Lexis 541 at p. *39].) Here, Jacobson has never suggested the prosecutor made use of M.M.'s inaccurate preliminary hearing testimony in a way that affected the course of his trial.

policy, evidence that Jacobson had been to the club before, and a potentially reasonable inference that because he was searched on a prior visit, that experience led him to leave his gun in his vehicle when he arrived and parked that night. Nothing prevented defense counsel from noting, as Jacobson's appellate counsel did at oral argument, the lack of evidence that Jacobson had in fact been searched on prior visits, and arguing the opposite inference. It was properly left up to the jury to agree with the prosecutor's suggested inference or not.

In sum, Jacobson has not shown that M.M.'s testimony was false, that the prosecutor argued a fact he knew to be false, or that the argument he did make was deceptive. He thus has not shown prosecutorial error.

## II.

### *Jacobson's Ineffective Assistance of Counsel Claim Should Be Addressed on Habeas Review.*

Jacobson also challenges the denial of his new trial motion. As relevant here, he sought a new trial based on a claim that Babcock was ineffective for not using the video to argue that, because Jacobson was not searched when entering the club, he could have had a gun all night.[6] The court denied his ineffective assistance claim because Babcock had not explained why he did not make that argument and the court perceived potential tactical reasons not to do so, and also concluded Jacobson suffered no prejudice. Jacobson contends the court erred, but we conclude that his ineffective assistance claim is more properly reviewed by way of his pending petition for writ of habeas corpus, which raises the same issues on a fuller record.

---

[6] Jacobson also sought a new trial based on the alleged violation of *Napue*, *supra*, 360 U.S. 264. Because no such violation occurred, we need not assess the trial court's stated reasons for declining to order a new trial on that basis.

13

As our Supreme Court has explained, it is generally "inappropriate for an appellate court to speculate as to the existence or nonexistence of a tactical basis for a defense attorney's course of conduct when the record on appeal does not illuminate the basis for the attorney's challenged acts or omissions, [so] a claim of ineffective assistance is more appropriately made in a habeas corpus proceeding, in which the attorney has the opportunity to explain the reasons for his or her conduct. 'Having afforded the trial attorney an opportunity to explain, courts are in a position to intelligently evaluate whether counsel's acts or omissions were within the range of reasonable competence.' " (*People v. Wilson* (1992) 3 Cal.4th 926, 936.)  Accordingly, appellate courts will reverse a conviction for ineffective assistance on direct appeal "only if (1) the record affirmatively discloses counsel had no rational tactical purpose for the challenged act or omission, (2) counsel was asked for a reason and failed to provide one, or (3) there simply could be no satisfactory explanation." (*People v. Mai* (2013) 57 Cal.4th 986, 1009.)

We conclude that, on the limited record on appeal, Jacobson has not shown any of the conditions listed in *People v Mai* to be satisfied in a way overriding the interests that favor resolving claims of ineffective assistance via habeas review—especially when, as here, a defendant has concurrently filed a habeas petition raising the same claims.

## III.

### *The Case Must Be Remanded for Resentencing.*

Finally, Jacobson claims we must remand for resentencing because the trial court did not realize the full scope of its sentencing discretion when it declined to strike his 25-year-to-life enhancement for personally and intentionally discharging a firearm causing Frazier's death (§ 12022.53, subd. (d)).  We agree.

14

The prosecution urged the trial court to impose consecutive terms of 25 years to life for murder, 25 years to life for the enhancement, and an upper term of 3 years for possessing a firearm as a felon, for a total of 53 years to life. Jacobson, by contrast, asked the court to strike the enhancement and stay imposition of sentence on the possession count. Neither party mentioned the possibility of striking the section 12022.53(d) enhancement and imposing a lesser enhancement.

At the October 2021 sentencing hearing, the trial court stated, "I'm well aware that I have discretion to strike the [section] 12022.53(d) enhancement." But it never expressed a view as to whether, if it struck the enhancement, it would have discretion to impose a lesser, uncharged enhancement. After declining to strike the enhancement, it sentenced Jacobson to 25 years to life for the murder, a consecutive term of 25 years to life on the enhancement, and a concurrent two-year midterm for possessing a firearm as a felon.

At the time of the sentencing hearing, it was uncertain whether a trial court had discretion to strike a section 12022.53(d) enhancement and then impose a lesser, uncharged firearm enhancement, or had only a "binary" discretion either to impose or to strike a section 12022.53(d) enhancement. (*Tirado*, *supra*, 12 Cal.5th at pp. 692, 694.) Section 12022.53 created "a tiered system of sentencing enhancements for specified felonies involving firearms." (*Tirado*, at p. 692.) Subdivisions (b), (c), and (d) mandate enhancements of 10 years for personally *using* a firearm during such a felony, 20 years for personally and intentionally *discharging* a firearm, and 25 years to life for doing so and *causing great bodily injury or death*. (*Tirado*, at p. 695, citing § 12022.53, subds. (b)–(d).) As enacted, the statute barred trial courts from striking those enhancements. (*Tirado*, at p. 695.) But in 2017,

15

the Legislature amended it to enable courts to do so in the interest of justice. (*Id.* at p. 696, citing Stats. 2017, ch. 682, § 2.)

Following that amendment, Courts of Appeal disagreed as to whether a trial court could strike a section 12022.53(d) enhancement and then impose a lesser, uncharged enhancement. (*Tirado, supra*, 12 Cal.5th at p. 696.)  In 2019, our Supreme Court granted review to resolve the split. (*People v. Tirado*, review granted Nov. 13, 2019, S257658.)  When the trial court sentenced Jacobson in 2021, the Supreme Court's review was still pending. Three months after Jacobson was sentenced, the Supreme Court issued *Tirado, supra*, 12 Cal.5th 688.  It held trial courts have discretion—after striking a section 12022.53(d) enhancement—to impose a lesser, uncharged firearm enhancement. (*Tirado*, at p. 697.)

Based on that clarification of the law, Jacobson contends he is entitled to a remand for resentencing, so the court can exercise a discretion it did not realize it had.  The Attorney General disagrees on two grounds.  Neither has merit.  The first is a misguided claim that Jacobson has not overcome the presumption a trial court knew and applied governing law. (*People v. Gutierrez* (2014) 58 Cal.4th 1354, 1390.)  The People argue that, given the grant of review in *Tirado* almost two years before Jacobson's sentencing, we must presume the court knew of the conflicting Court of Appeal opinions and its ability to follow either view. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 456.)  But the presumption a court knew the law "does not apply where the law in question was unclear or uncertain when the lower court acted." (*People v. Jeffers* (1987) 43 Cal.3d 984, 1000.)

Second, the People contend that even if the trial court did not realize the scope of its discretion, remand would be an idle act.  We disagree.  As we have previously acknowledged, if a court has imposed sentence while

16

assuming it lacked a discretion later conferred, we must remand so it can exercise its full discretion. (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425 (*McDaniels*). The only instance in which we can decline to remand is if " ' "the record shows that the trial court would not have exercised its discretion even if it believed it could do so." ' " (*Ibid*.) The standard is whether the court "clearly indicated when it originally sentenced the defendant that it would not in any event have stricken [the relevant] enhancement." (*Ibid*.)

In adopting that strict standard, we rejected a standard that would require remand only if there is a " 'reasonable probability' " the trial court will strike an enhancement. (*McDaniels*, *supra*, 22 Cal.App.5th at p. 426.) We noted that factors considered under that standard—such as the egregious or recidivist nature of a defendant's crimes—may be relevant to whether a court is *likely* to exercise discretion in a defendant's favor but "cannot alone establish what the court's discretionary decision would have been" on an issue it never decided. (*Id*. at p. 427.) Remand is thus required unless such factors led the trial court "to express its intent to impose the maximum sentence permitted" or in some other way to indicate clearly that it "will not exercise its discretion in the defendant's favor." (*Ibid*.)

Our Supreme Court recently cited *McDaniels* with approval and reaffirmed the rigor of the " 'clearly indicate[d]' " standard. (*People v. Salazar* (2023) 15 Cal.5th 416, 425, 431–432, citing *McDaniels*, *supra*, 22 Cal.App.5th at p. 426.) When the law has changed, our high court cautioned, "it is almost always speculative for a reviewing court to say what the sentencing court would have done if it had known the scope of its discretionary powers." (*Salazar*, at p. 431.)

17

Here, the People try to show a clear indication the trial court would not in any circumstances have stricken the section 12022.53(d) enhancement, but they fall short. They note the court listed many aggravating factors that weighed against striking the enhancement. They also quote the court's comments that Jacobson "is a very, very dangerous, dangerous man" and would be "extremely dangerous if he ever is on the street and able to get guns," and its conclusion this was not a case in which to strike the section 12022.53(d) enhancement "or the punishment for it" because this case is "one that requires it."

But the trial court made the latter comment while possibly believing its only alternative was to impose no punishment at all for firearm use. It did not state that this case required the *maximum* firearm-based punishment of 25 years to life *rather than* one of 10 or 20 years. (§ 12022.53, subds. (b)–(d).) At most, the court's other negative comments arguably make it *likely* it will reimpose the section12022.53(d) enhancement on remand; they do not "clearly indicate" it will do so. (*McDaniels*, *supra*, 22 Cal.App.5th at p. 425.)

Nor did the trial court indicate it would *never* exercise discretion in Jacobson's favor. (*McDaniels*, *supra*, 22 Cal.App.5th at pp. 425–426.) To the contrary, it in fact did exercise such discretion in a way strikingly parallel to *McDaniels*. The sentence there was identical to Jacobson's: consecutive terms of 25 years to life for murder and for a section 12022.53(d) enhancement, and a two-year concurrent term for possessing a firearm as a felon. (*McDaniels*, at p. 423.) We noted the trial court had "expressed no intent to impose the maximum sentence" but instead "imposed the midterm for being a felon in possession of a firearm" and made that term concurrent. (*Id.* at p. 428.) Here, the trial court made exactly the same choice, rejecting the prosecution's request that it impose a three-year consecutive term.

18

That decision reduced Jacobson's total sentence from the potential maximum of 53 years to life to 50 years to life. We cannot say this record clearly indicates the trial court will inevitably decline, on remand, to exercise its discretion to further reduce the total sentence to 45 years to life or 35 years to life by striking the section 12022.53(d) enhancement and imposing one of 10 or 20 years under subdivisions (b) or (c) of section 12022.53. (*McDaniels, supra,* 22 Cal.App.5th at pp. 425–426.) Whether to do so is a choice the trial court must in the first instance make. (*People v. Salazar, supra,* 15 Cal.5th at p. 432.)

## DISPOSITION

The judgment of conviction is affirmed. The sentence is vacated, and the matter is remanded for resentencing.

LANGHORNE WILSON, J.

WE CONCUR:

BANKE, ACTING P. J.

SIGGINS, J.[*]

A164149

*People v. Jacobson*

---

[*] Retired Presiding Justice of the Court of Appeal, First Appellate District, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.